**In re Dr. John DOE, M.D., A Witness Before the January 1982, Additional Grand Jury.**

**No. M11–188(CES).**

United States District Court, S.D. New York.

Dec. 13, 1982.

Opinion On Production of Redacted Documents March 1, 1983.

Philip Le B. Douglas, Asst. U.S. Atty., New York City, for plaintiff.

Kostelanetz & Ritholz, New York City, for defendant.

## MEMORANDUM DECISION

STEWART, District Judge:

The government moves pursuant to Fed. R.Cr.P. 17(g) for an order citing Dr. John Doe, M.D.,[1] for contempt because of his failure to comply with a Grand Jury subpoena duces tecum dated October 27, 1982.[2] The government issued this subpoena in connection with its investigation of Jorum Associates, Inc. ("Jorum"), a now defunct corporation, alleged by the government to have been operated as a front for the illegal sale of methaqualone prescriptions ("Quaalude") to customers posing as patients with stress-induced sleep problems. The subpoena requests that Dr. Doe produce patient files relating to all persons treated on the premises of Jorum, financial records relating to compensation by Jorum, and Schedule II prescription forms reflecting drugs prescribed by Dr. Doe on the premises of Jorum.[3] Dr. Doe contends the subpoena is unenforceable because it violates his rights under the Fifth Amendment and because it seeks documents protected by the psychotherapist-patient privilege.

We find that production of the patient files and Schedule II prescription forms will not violate Dr. Doe's Fifth Amendment rights since these documents are within the "required records" exception to the Fifth Amendment privilege against compelled production of private papers. This exception permits the compelled production of private records which a government agency requires to be maintained, as long as (1) the records are of a type normally kept by the person under subpoena; (2) the requirement that they be kept is essentially regulatory; and (3) the records have some "public aspect" to them. *Grosso v. United States,* 390 U.S. 62, 67–68, 88 S.Ct. 709, 713–714, 19 L.Ed.2d 906 (1968) (citing *Shapiro v. United States,* 335 U.S. 1, 68 S.Ct. 1375, 92 L.Ed. 1787 (1947)). The Schedule II prescription forms sought by the subpoena clearly meet these elements. Under N.Y.Pub.Health Law §§ 3332 and 3338(2) (McKinney's 1977 & Supp.1982), medical practitioners are required to prepare "official New York state prescriptions" for all Schedule II prescriptions, and retain copies for five years. Once the prescription is filled, one copy is sent by the dispensing pharmacist to the New York State Department of Health in Albany. *See* N.Y.Pub.Health Law § 3333(4)

---

1. The witness has requested he be referred to in this opinion as Dr. Doe for confidentiality purposes.

2. The subpoena dated October 27, 1982 replaced two earlier subpoenas served by the government on Dr. Doe on September 24, 1982 and October 15, 1982. The government withdrew these earlier subpoenas in response to contentions by Dr. Doe that they required him to admit certain facts concerning his relationship with Jorum.

3. Specifically, the subpoena requests:
    (1) All patient files relating to persons purportedly treated by you on the premises of Jorum Associates, 201 E. 34th Street, New York, New York; United States Engineering and Management, 201 East 34th Street, New York; and American Professional Managers, 56 East 41st Street, New York, New York in the period August 1981—June 1982;
    (2) Financial records, including IRS Form W–2, relating to your compensation by Jorum Associates, Inc., American Professional Managers, Inc., and United States Engineering and Management;
    (3) All Schedule II prescription forms reflecting drugs prescribed by you at 201 East 34th Street, New York, New York, and 56 East 41st Street, New York, New York.
    The government alleges that United States Engineering and Management Corp. assumed Jorum's operations in early 1982, and that American Professional Managers, Inc. was a "spin off" of Jorum.

(McKinney's 1977 & Supp.1982). The State of New York instituted these regulations in response "to a concern that such drugs were being diverted into unlawful channels". *Whalen v. Roe,* 429 U.S. 589, 592, 97 S.Ct. 869, 872, 51 L.Ed.2d 64 (1977). Among the purposes of the regulations is the goal of preventing doctors "from over-prescribing, either by authorizing an excessive amount in one prescription or by giving one patient multiple prescriptions". *Id.* The records required to be kept by N.Y.Pub.Health Law § 3332 thus resemble those required by the former 21 U.S.C. § 360a(d), which was considered in *United States v. Warren,* 453 F.2d 738, 742 (2d Cir.), *cert. denied,* 406 U.S. 944, 92 S.Ct. 2040, 32 L.Ed.2d 331 (1972). Section 360a(d) required practitioners to make and keep records on the acquisition and disposition of amphetamines. *Id.* The purpose of section 360a(d), like that of Pub. Health Law § 3332, was to monitor the flow of covered drugs from manufacturer to consumer so as to pinpoint areas of diversion. *See* S.Rep. No. 337, [1965] U.S.Code Cong. & Adm.News at 1895, 1901. In *Warren,* the Second Circuit found that seizure of records reflecting a medical doctor's administration of amphetamine injections did not violate the doctor's rights under the Fifth Amendment because such records, being "part of a regulatory scheme with public purposes, are not protected by the Fifth Amendment". 453 F.2d at 742. The records kept pursuant to N.Y.Pub.Health Law § 3332 are similarly "part of a regulatory scheme with public purposes". Accordingly, the Fifth Amendment does not bar their production.

While we have not found any cases directly on point with respect to the request for patient files, we believe these records fall within the *Shapiro-Grosso* rule as well. In New York, the State Board of Regents ("Regents") supervises the admission to and practice of the medical profession. N.Y. Educ.Law § 6506 (McKinney's 1972 & Supp.1982). The Regents have the authority to define "unprofessional conduct" and to suspend, revoke or annul the licenses of those found guilty of unprofessional conduct. N.Y.Educ.Law §§ 6509 and 6511

(McKinney's Supp.1982). In the health professions, "unprofessional conduct" includes the failure to "maintain a record for each patient which accurately reflects the evaluation and treatment of the patient." 8 N.Y.C.R.R. § 29.2(3). These records must be maintained for at least six years, *id.,* and must be made available, upon a patient's written request, to the patient or to another licensed health practitioner. 8 N.Y.C.R.R. § 29.2(6).

Applying the *Grosso-Shapiro* test to these facts, patient files clearly meet the first element: they are of a type normally kept by a medical practitioner. The files also meet the second element, i.e., the requirement that they be kept is "essentially regulatory". The rationale for this element is to prevent the government from directing regulations at a single group suspected of criminal activities, as was the case in *Marchetti v. United States,* 390 U.S. 39, 57, 88 S.Ct. 697, 707, 19 L.Ed.2d 889 (1968) (required records exception not applicable to documents required by gambler registration law). In this case, the state requires that files be kept not to identify criminals, but to ensure that the citizens of New York receive high-quality medical treatment. *Cf. Schwarz v. Board of Regents,* 89 A.D.2d 711 at 712, 453 N.Y.S.2d 836 (N.Y.App.Div.1982) ("The purpose of the record-keeping requirement is, at least in part, to provide meaningful medical information to other practitioners should the patient transfer to a new physician or should the treating physician be unavailable for any reason.") The precise meaning of the third element of the required records exception—that the records have "public aspects"—is not spelled out in the *Grosso* opinion. One commentator has suggested that application of the phrase "public aspect" should depend "not on the fact that the keeping of records is required by public officials but on the fact that the records are known to some members of the public." The Supreme Court, 1967 Term, 82 Harv.L.Rev. 95, 201 (1968). Language in recent opinions in this circuit suggests that if records are maintained pursuant to a valid regulatory program, they

then have a "public aspect" for purposes of constitutional analysis. *See Donovan v. Mehlenbacher,* 652 F.2d 228, 231 (2d Cir. 1981); *United States v. Silverman,* 449 F.2d 1341, 1345 (2d Cir.1971), *cert. denied,* 405 U.S. 918, 92 S.Ct. 943, 30 L.Ed.2d 788 (1972); *United States v. LaPage,* 441 F.Supp. 824, 826–27 (N.D.N.Y.1977). The files in question here meet both of these interpretations of the "public aspect" requirement. As discussed above, the records are maintained pursuant to a valid regulatory scheme. They are also known to members of the public aside from the doctor who created them (e.g., patients, physician assistants, subsequent doctors). In terms of the number of persons who could view the documents, these patient files were at least as "public" as the closing statements at issue in *United States v. Silverman,* 449 F.2d at 1345.[4] While patient files themselves are not regularly inspected by state administrators, moreover, a state board for professional medical misconduct is expressly authorized to examine and obtain patient records in the course of its investigations. N.Y.Pub.Health Law § 230(10)(1) (McKinney's Supp.1982); *see also Schachter v. Whalen,* 581 F.2d 35, 37 (2d Cir.1978).

We acknowledge that patient files are not the usual type of document to which the required records exception is applied. Given the nature of New York's scheme for regulation of licensed physicians, however, we believe the doctrine is applicable here. Accordingly, we hold that no valid Fifth Amendment privilege exists as to the documents requested in item one of the October 27, 1982 subpoena.[5]

Dr. Doe also argues that even if the Fifth Amendment does not bar compelled production of these records, a "psychotherapist-patient privilege" does. Congress has refused to adopt Proposed Fed.R.Evid. 504, which would have specifically added such a privilege to the Federal Rules.[6] *United States v. Witt,* 542 F.Supp. 696, 698 (S.D.N. Y.1982). Recognition of such a privilege is still theoretically possible, however, by virtue of Fed.R.Evid. 501 ("the privilege of a witness ... shall be governed by the principles of the common law as they may be interpreted by the Courts of the United States in light of reason and experience"). To date, the cases finding such a privilege under this rule are few—and in those in which the privilege has been endorsed, it has generally been recognized as a limited right, subject to balancing with other societal interests. *See Lora v. Board of Education,* 74 F.R.D. 565, 576–577 (E.D.N.Y.1977). Under this balancing approach, the privilege has recently been denied in two cases in this district dealing with alleged "stress clinics". *United States v. Witt,* 542 F.Supp. 696, 699 (S.D.N.Y.1982); *In re Grand Jury Subpoena Served Upon Astor Medical Services,* M–11–188, Transcript at 12–15 (S.D. N.Y. Feb. 17, 1981) (oral opinion). This case resembles *Witt* and *Astor Medical* in that it contains evidence tending to show that Jorum was merely a front for the distribution

---

4. The statements in *Silverman* had been filed pursuant to New York Court Rules § 603.4(b) (McKinney's 1970) and reflected the amounts of compensation received by the attorney in contingent fee cases. Under New York Court Rules § 603.4(c)(1) (McKinney's 1970), all statements so filed were to be

> deemed to be confidential and the information therein contained shall not be divulged or made available for inspection or examination except upon written order of the Presiding Justice of the Appellate Division.

5. Given the disposition of this issue, we need not address the government's contention that these files are also corporate records. As we do not rely upon any information contained in the government's *ex parte* affidavit in reaching

our decision, moreover, we see no need to allow Dr. Doe to examine that affidavit or to cross-examine any witnesses referred to therein.

6. Proposed Fed.R.Evid. 504(b) provided:

> A patient has a privilege to refuse to disclose and to prevent any other person from disclosing confidential communications, made for the purpose of diagnosis or treatment of his mental or emotional condition, including drug addiction, among himself, his psychotherapist, or persons who are participating in the diagnosis or treatment under the direction of the psychotherapist, including members of the patient's family.

of Quaaludes.[7] On the other hand, this case is distinguishable from those two cases in that Dr. Doe is a board certified psychiatrist with some amount of professional experience, while defendant Witt's medical specialty had been obstetrics, 542 F.Supp. at 698, and the principals of Astor Medical Services were apparently not doctors at all. Tr. at 13–14. Under these circumstances, we believe the proper course is to require production of the files, but allow the witness to redact all references to the identity of the patients. This should sufficiently protect any privacy interest that former patients may hold, *see Lora v. Board of Education,* 74 F.R.D. at 586–587, without unduly hampering the government's lawful investigation of Jorum's operations. If upon inspection, the government should discover the files contain no entries that can be considered "confidential communications" and present reasons why discovery of the patients' identity is necessary, modification of this decision is possible. ·

The remaining items sought in this subpoena are Dr. Doe's "financial records" concerning his compensation by Jorum. The government argues rather generally that some of these records may be producible under the "required records" exception. It also argues that production of these records would not constitute an incriminating testimonial communication and thus under *Fisher v. United States,* 425 U.S. 391, 96 S.Ct. 1569, 48 L.Ed.2d 39 (1976), no valid Fifth Amendment privilege can be claimed. We agree that some of these records (e.g. W–2 and other tax forms) may indeed fall within the required records exception. *See Matter of Grand Jury Empanelled March 19, 1980,* 541 F.Supp. 1, 3 (D.N.J.1981), *aff'd,* 680 F.2d 327 (3d Cir.1982). However, we do not agree that production of those documents that are not "required records" can be compelled under the authority of *Fisher.*

■ *Fisher* held that compliance with an Internal Revenue Service summons direct-

ing a taxpayer to produce his accountant's document involved "no incriminating testimony within the protection of the Fifth Amendment." 425 U.S. at 414, 96 S.Ct. at 1582. While the Court rejected the view that the Fifth Amendment is "a general protector of privacy", *id.* at 401, 96 S.Ct. at 1576, it also specifically noted that *Fisher* did not decide the question of whether the Fifth Amendment would shield a taxpayer from producing his own tax records in his possession. *Id.* at 414, 96 S.Ct. at 1582. Subsequent cases in this circuit suggest that the Fifth Amendment does provide such protection. *See In re Grand Jury Subpoena Duces Tecum Dated April 23, 1981,* 657 F.2d 5, 8 n. 1 (2d Cir.1981); *United States v. Beattie,* 541 F.2d 329, 331 (2d Cir.1976). *Accord, Matter of Grand Jury Empanelled March 19, 1980,* 680 F.2d 327, 333 (3d Cir.1982). The facts of this case make it clear that compliance with this request could result in self-incrimination. The existence of records reflecting compensation by Jorum is by no means a "foregone conclusion", particularly in light of Dr. Doe's assertion that he was never an employee of Jorum. *See Matter of Grand Jury Subpoena Duces Tecum Served Upon John Doe,* 466 F.Supp. 325, 327 (S.D.N.Y. 1979). This request also raises substantial problems of authentication since these records presumably were created by Dr. Doe. *See Matter of the Grand Jury Empanelled March 19, 1980,* 680 F.2d 327, 335 (3d Cir. 1982). Under these circumstances, we are unable to say that responding to this request would not represent a substantial threat of self-incrimination. Accordingly, Dr. Doe does have a valid Fifth Amendment claim as to those documents requested by item two of the October 27, 1982 subpoena which do not fall within the required records exception.

As the subpoena is now written, the only required records specifically requested are W–2 forms relating to Dr. Doe's compensa-

---

**7.** It is apparently a matter of public record that Dr. Doe wrote Quaalude prescriptions for approximately 592 patients between August 1981 and June 1982, and of those approximately 592 patients, at least 287 received Quaalude pre-

scriptions from other physicians associated with Jorum. In the period between December 1981 and May 1981, physicians associated with Jorum together wrote approximately 1500 Quaalude prescriptions per month.

tion by Jorum. We require Dr. Doe to produce these to the government. In the absence of further specification of records that might fall within that exception, however, we decline to order any further production.

To summarize, we direct Dr. Doe to produce all Schedule II prescription forms as requested in item three of the October 27, 1982 subpoena; all patient files as requested in item one, redacted in the manner set forth above; and all W–2 forms relating to compensation by Jorum.

SO ORDERED.

## On Production of Redacted Documents

On December 13, 1982, we issued a Memorandum Decision directing Dr. Doe to produce the patient files requested in the government's subpoena duces tecum dated October 27, 1982, but allowing Dr. Doe to redact the names of the patients from the files to protect any privacy interests the patients might have. *See In re Dr. John Doe, M.D.,* 97 F.R.D. 640 at 644 (S.D.N.Y. 1982). In that decision, we indicated that if the government discovered upon receipt of the redacted records that they contained no "confidential communications", and if the government established that discovery of the patients' identity was necessary, we would consider requiring production of the files unredacted. *Id.* Although the government has not yet received the redacted files, it has requested in a letter dated February 5, 1983 that we modify our decision to require production of the records in their original form. The witness, Dr. Doe, while opposing the government's requested modification, has also requested in a letter dated February 14, 1983 that we "rule finally on whether the patients' names must be revealed". At a conference with the parties on February 17, 1983, we heard oral argument on the issues, and requested Dr. Doe to produce for *in camera* review twenty-five files of patients seen on the premises of Jorum Associates, Inc.[1]

■ Based on our examination of these twenty-five files, we conclude that no "psychotherapist-patient privilege" should apply in this case. The files produced do not contain any entries evincing deep or sustained probings of the patients' mental or emotional conditions. Rather, they contain only general medical histories, descriptions of the patients' sleep habits and problems, and surveys of various factors (e.g., "stressful life circumstances") affecting the patients' ability to sleep. The function of a psychotherapist-patient privilege is to protect the intensely personal communications individuals make in the course of therapy. As the Advisory Committee noted in support of Proposed Fed.R.Evid. 504:

> Among physicians, the psychiatrist has a special need to maintain confidentiality. His capacity to help his patients is completely dependent upon their willingness and ability to talk freely ... The relationship may well be likened to that of priest-penitent or the lawyer-client. Psychiatrists not only explore the very depths of their patients' conscious, but their unconscious feelings and attitudes as well. Therapeutic effectiveness necessitates going beyond a patient's awareness and, in order to do this, it must be possible to communicate freely. A threat to secrecy blocks successful treatment.

Advisory Committee Notes to Proposed Rule 504, Federal Rules of Evidence, 56 F.R.D. 183, 242 (1972). *See also United States ex rel. Edney v. Smith,* 425 F.Supp. 1038, 1043–44 (E.D.N.Y.1976), *aff'd,* 556 F.2d 556 (2d Cir.1977). We find nothing in the files we have examined that suggests that communications on this level were elicited by Dr. Doe.[2] Indeed, the files we have examined appear to contain no more information than would be found in a non-psychiatric physician's files. A physician-patient privilege is unknown to the common

---

1. To ensure that the files we examined would be typical, we asked Dr. Doe to select five representative files from each of the five months that he saw patients on the premises of Jorum Associates.

2. We also deem of significance that in one file, Dr. Doe noted that he "counseled patient that he has got to get psychotherapy", and in others it appears he recommended "ed[ucation] and counseling". This suggests to us that Dr. Doe

law, *Whalen v. Roe,* 429 U.S. 589, 602 n. 28, 97 S.Ct. 869, 877 n. 28, 51 L.Ed.2d 64 (1977), and none has been accorded in the federal courts as a general evidentiary principle. *See United States v. Mullings,* 364 F.2d 173, 176 n. 3 (2d Cir.1966); *Robinson v. Magovern,* 83 F.R.D. 79, 90 (W.D.Pa.1979); *Felber v. Foote,* 321 F.Supp. 85, 87–88 (D.Conn. 1970).

In light of the other important interests against which we must balance Dr. Doe's assertion of privilege, *see United States v. Witt,* 542 F.Supp. 696, 699 (S.D.N.Y.1982), we believe his assertion of privilege must fail. The government has stated that the Grand Jury is investigating possible criminal conduct by patients of Jorum, as well as of Jorum's principals, and has listed several other reasons why having the patient names will aid the Grand Jury's efforts. Letter of Philip Le B. Douglas dated February 3, 1983 at 3–4. Accordingly, we hereby order Dr. Doe to produce all patient files called for by the government's October 27 subpoena.[3]

SO ORDERED.

himself did not view his services as psychotherapy or counseling.

3. Since we have based this decision on an examination of the files themselves, we do not find it necessary to consider Dr. Doe's request to examine the government's *ex parte* submissions in this case. We should make clear that this disposition does not mean that we find that Dr. Doe would be entitled to examine such submissions and cross-examine witnesses had we relied upon these submissions. We simply do not reach the issue.