**Isaac LORA, et al., Plaintiff,**

v.

**The BOARD OF EDUCATION OF the CITY OF NEW YORK, et al., Defendant.**

**No. 75 Civ. 917.**

United States District Court, E.D. New York.

Aug. 2, 1984.

Lenore Gittis, The Legal Aid Society, Juvenile Rights Division by Henry S. Weintraub, Jane M. Sufian, New York City, for plaintiff.

Frederick A.O. Schwarz, Jr., Corp. Counsel for the City of New York by Noel Ferris, New York City, for defendant.

## JUDGMENT and ORDER

### WEINSTEIN, Chief Judge:

A class action was brought predicated on claims that the constitutional and statutory rights of many students in the New York City school system were being violated by the procedures and facilities afforded for the education of children whose emotional problems resulted in severe acting out and aggressive behavior in school. After extensive evidence taken in court, visits to schools and examination of the literature in the field, the court held that the process of evaluating students to determine if they should enter special day schools violated the students' statutory and due process rights. It found that the system was racially segregated and discriminatory. The court also held that lack of funds was no excuse for continuing the unsatisfactory practices. See the extensive discussion of the facts and law in *Lora v. Board of Education of City of New York*, 74 F.R.D. 565 (E.D.N.Y.1977); *Lora v. Board of Education*, 456 F.Supp. 1211 (E.D.N.Y.1978), *remanded*, 623 F.2d 248 (2d Cir.1980).

The court ordered extensive retraining of teachers and others in addition to the preparation of special materials for in-house training to remedy the illegalities. It also suggested using experts in communications, education and other fields to assist in the preparation of readily understandable explanations to parents and children of their rights. It commended the efforts of the school authorities to meet communication and other problems. It required reports by the City on action taken to comply with the court's directive and it requested that representatives of the New York State Department of Education and of the United States Department of Health, Education and Welfare participate in conferences to provide necessary standards and training programs.

To assist the parties, the court appointed a special Lora Advisory Panel of independent experts to serve without fee, but with reimbursement for travel expenses and an honorarium of $100 a day each for time spent on panel meetings. Two members each were selected by the plaintiffs, the New York City Board of Education and the United States, and one by the Public Education Association, *amicus*. An eighth member was appointed to serve *ex officio*. The court met with the Panel in chambers with counsel present and discussed the need for appropriate standards.

A number of drafts of proposed standards were developed. Some were rejected by the court as inappropriate with the request that the parties and Panel continue their work. A number of intermediate orders and amendments to the court's decrees were adopted by stipulation as practical problems were revealed in the field.

Funds for the project and necessary studies were provided in large measure by HEW because it was expected that the standards would be a model for other parts of the country. Technical assistance was afforded by HEW and the Civil Rights Division of the Department of Justice. New York State Education authorities also provided assistance. The City of New York supplied an office and other facilities at the headquarters of the Board of Education. The Board's many experts and teachers expended thousands of hours on meetings and training courses. Private citizens such as those associated with the Public Education Association also gave many days to the project.

The members of the Panel were: Hannah Flegenheimer, Associate Coordinator for

Regional Programs, New York State Department of Education; Dr. Jeanette E. Fleischner, Department of Special Education, Teachers College of Columbia University; Dr. Robert Guarino, Director of Division of Supervision, New York State Department of Education; Dr. Joseph R. Jenkins, Experimental Education Unit, University of Washington, Seattle; Dr. John L. Johnson, College of Education and Human Ecology, University of the District of Columbia; Dr. Carmen Ortiz, Director of Bilingual Special Education Program, Special Education Department, Bank Street College of Education; Norman S. Rosenberg, Esq., Co-director of Developmental Disabilities Rights Center, Mental Health Law Project, Washington, D.C.; and Dr. Frank H. Wood, Professor of Educational Psychology and Special Education, University of Minnesota. The Panel staff consisted of Marilyn Nixon, Consultant on Educational Affairs and Richard James, Assistant to the President, Bronx Community College.

While it has taken considerable time for the court's orders to be carried out, the time has been well spent by the parties. They have worked assiduously over the years in developing and perfecting a variety of programs and standards. The court wishes particularly to commend counsel, *amicus curiae* and the members of the Lora Advisory Panel who assisted in this project.

The parties have now entered into a stipulation implementing a program of "Non-Discriminatory Standards and Procedures." *See* Appendix and Appendix A, attached. The court is pleased to approve this stipulation. The cooperative work of the various attorneys, school personnel, experts and city, state and federal authorities provide a wholesome example of how disputes of this kind can be peaceably resolved. A minimum of adversarial litigation by lawyers and maximum utilization of the goodwill of experts and others interested primarily in the welfare of the children have benefited both the children and the public.

The case will be closed subject to receiving the reports as required by the stipulation. Any party may move to reopen the case at any time. This constitutes a final judgment.

So ordered.

## APPENDIX

UNITES STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

ISAAC LORA, et al.,

Plaintiffs,

– against –

THE BOARD OF EDUCATION OF THE CITY OF NEW YORK, et al.,

Defendants,

UNITED STATES OF AMERICA,

Amicus Curiae

75 Civ. 917 (JBW)
STIPULATION

IT IS HEREBY CONSENTED TO AND AGREED BY AND BETWEEN THE UNDERSIGNED ATTORNEYS FOR THE PARTIES THAT:

1. Defendants shall issue and implement the standards and procedures contained in Appendix A, henceforth referred to as the Non-discriminatory Standards and Procedures, not later than September 30, 1984.

2. The Chancellor shall monitor the progress made and the problems encountered by the Sub-Committees on the Handicapped and Community School Districts in

implementing the Non-discriminatory Standards and Procedures and shall report to the Board of Education the results of this monitoring on the following timetable:

December 15, 1984

July 15, 1985

December 15, 1985

July 15, 1986

December 15, 1986

Upon submission by the Chancellor, the Board of Education shall provide these reports to the plaintiffs, *amici curiae* and the Court.

3. Defendants shall disseminate, in a variety of appropriate media, and in a form to be understood by the major language groups, as defined by the Chancellor, information regarding the referral procedures to be followed by parents, by instructional personnel, and by community agency personnel.

4. a. Defendants shall continue to train instructional personnel in the referral process. The training shall be designed to ensure that staff members give careful and sensitive attention to linguistic, cultural and ethnic identification of students during the referral process.

b. Defendants shall continue to train assessment personnel in acceptable professional standards with periodic review and shall provide adequate supervision.

c. Defendants shall continue to train assessment personnel to be familiar with and sensitive to the linguistic, cultural and ethnic identification of students. Assessment personnel shall use this knowledge and sensitivity in identifying the language in which the student shall be assessed, in selecting the procedures to be used to assess the student's personal and social adjustment and in interpreting the data collected.

5. Defendants shall establish procedures for the collection, filing and retrieval of referral data.

a. Defendants shall monitor and regularly examine the number of general education students referred by school staff, by parents, and by other sources.

b. Defendants shall establish procedures to collect data on the ethnicity of general education students referred for assessment. The referrals for each ethnic group shall be compared with the ethnic enrollment of the local school district or other relevant school population, provided that comparison shall not be made on a regional basis except as a means of supplementing other comparisons for other than the high school regions. Where there is a statistically significant difference, further analysis shall be conducted and appropriate action taken.

c. Defendants shall establish procedures to collect data on the ethnicity of students classified as emotionally disturbed and placed in public and private special education. The classifications and placements of each ethnic group shall be compared with the ethnic enrollment of the local school district or other relevant school population provided that comparisons shall not be made on a regional basis except as a means of supplementing other comparisons for other than the high school regions. Where there is a statistically significant difference, further analysis shall be conducted and appropriate action taken.

d. Defendants shall continue to monitor periodically the appropriateness of eligibility and placement decisions made by School Based Support Teams and the District Subcommittees on the Handicapped.

6. Until such time as defendants fully implement the Child Assistance Program ("CAP") data system, defendants shall collect and analyze the data required by paragraphs 5(b) and 5(c) in the following manner:

a. During the period of transition to the CAP data system, defendants shall continue to collect data on the data bank on the ethnicity of students who complete the evaluation process. Defendants shall perform data comparisons and analyses based on the data available on the data bank.

b. During this period of transition, defendants shall add school districts to the CAP data system in order to develop a data base on the ethnicity of all students referred for assessment regardless of whether or not they complete the evaluation pro-

cess. Defendants shall perform data comparisons and analyses based on the data available in the CAP data system, as each region is added to that system.

c. It is understood that data on the ethnicity of students referred to in paragraphs 5 and 6 is being collected by defendants solely for purposes of monitoring this Stipulation. The Chancellor shall take necessary steps to ensure that individually identifiable ethnic data is maintained in a secure and confidential manner and in a form that is not personally identifiable.

7. Defendants shall collect the data necessary for the analyses required in paragraphs 5(b), 5(c), 6(a) and 6(b) not later than each July 31st and February 28th for a period of two years following the signing of this Stipulation. In the event that defendants find such comparisons indicate statistically significant differences, defendants shall notify plaintiffs and *amici curiae* of such findings within 15 days and shall undertake such further analysis as may be required. Upon request of plaintiffs and *amici curiae*, defendants shall make available the comparisons, analyses and the aggregate data on which they are based.

8. Data pertaining to the ethnicity of students referred for and receiving special education services that is made available to the plaintiffs, *amici curiae* and the Court for purposes of this Stipulation shall be provided in an aggregate form only. It is understood that the data shall be available on an aggregate basis to the local school district or high school region level. Plaintiffs shall use this ethnic data only for purposes of monitoring this Stipulation. Counsel for plaintiffs, *amici curiae* and their designees who may obtain access to any personally identifiable information collected pursuant to this Stipulation shall not disclose this information.

9. Defendants shall provide a written report which shall include an interpretation of the results of the analyses described in paragraph 7 and which shall also describe any responsive action taken or to be taken to the plaintiffs, *amici curiae* and the Court on the following dates:

December 1, 1984
July 1, 1985
December 1, 1985
July 1, 1986
December 1, 1986

10. Upon agreement of the parties, submission of one or more of the reports enumerated in paragraphs 2 and 9 may be waived.

11. Defendants shall be entitled to modify the Non-discriminatory Standards and Procedures pursuant to their educational and administrative judgment without making a formal motion to the Court. Any such modifications shall be consistent with all applicable provisions of law and the intent of the Non-discriminatory Standards and Procedures.

12. At least fourteen days prior to issuance, defendants shall forward to plaintiffs and *amici curiae* all documents which modify the Non-discriminatory Standards and Procedures.

13. Upon defendants' notification of the proposed modification to plaintiffs and *amici curiae*, plaintiffs shall have fourteen days to submit to defendants their objection, if any, concerning the modification.

14. If the matter is not resolved within fourteen days after submission to defendants of plaintiffs' objection, except upon express agreement of the parties, plaintiffs shall have the right to bring the matter to the Court for resolution within 10 days.

15. If plaintiffs' objection is brought before the Court, the burden shall be on the plaintiffs to show that defendants' proposed modification will violate applicable provisions of law and the intent of the Non-discriminatory Standards and Procedures.

16. Defendants shall not modify the Non-discriminatory Standards and Procedures until the steps described in paragraphs 12–14 of this Stipulation have been completed.

17. This Stipulation shall be binding upon each of the defendants, their agents, employees and representatives and upon

their successors in office without the necessity for formal intervention.

18. All reporting and notification requirements under this Stipulation shall terminate and the Court shall relinquish jurisdiction over this matter upon defendants' submission of the final report on December 15, 1986.

> Lenore Gittis, Esq.
> The Legal Aid Society
> Juvenile Rights Division
> 15 Park Row—21st Floor
> New York, New York 10038
> Henry S. Weintraub
> Henry S. Weintraub, Esq.
> Jane M. Sufian, Esq.
> Attorneys for Plaintiffs
> FREDERICK A.O. SCHWARZ, JR.
> Corporation Counsel for the
>   City of New York
> Attorney for Defendants
> 100 Church Street
> New York, New York 10007
> By: Noel Anne Ferris
>       Noel Ferris, Esq.
>       Assistant Corporation Counsel

SO ORDERED
Dated: August 2, 1984
Brooklyn, New York
Jack B. Weinstein
Jack B. Weinstein
Chief Judge

## APPENDIX A
## NONDISCRIMINATORY STANDARDS AND PROCEDURES
### INTRODUCTION

These standards and procedures apply to all schools and programs throughout the city district. The Non-discriminatory Standards and Procedures stated here seek to ensure that the referral, assessment and placement process for students who may have handicapping conditions occurs in a fair and nonbiased manner. These procedures are designed to guide all school staff in planning for the appropriate services for students from the many diverse cultural, linguistic and ethnic groups that constitute the New York City school system.

1. DEFINITIONS

1.1 As used herein, "major language groups" shall be defined to include those languages identified by the Chancellor based on a survey of home languages and the need for bilingual assessment and instruction. The Chancellor shall review periodically and revise by addition or deletion this definition as necessary.

1.2 As used herein, the phrase "ethnic group" shall be defined to include Black (not Hispanic), White (not Hispanic), Hispanic, American Indian or Alaskan Native, Asian or Pacific Islander.

2. REFERRAL

2.1 Prior to initiating a referral, the school staff member shall investigate regular education alternatives as an attempt to resolve the problem. If indicated, regular education alternatives are the preferred intervention. Appropriate intervention strategies should be tried, monitored for change and documented. Applicable laws and regulations regarding referrals shall be followed.

2.2 The school staff member shall present information supporting the referral to the appropriate personnel.

2.3 The school staff member initiating the referral shall record a brief descriptive statement of the problem, including descriptions of the student's behavior as it relates to the statement of the problem identified in the referral, the frequency of the behavior, and, unless clearly unnecessary, the comparable behavior of other students in the classroom.

3. ASSESSMENT

3.1 The District Subcommittee on the Handicapped or its designee shall inform parents of the process used to assess their child's educational needs in school. They shall be informed about:

a. who made the referral;

b. why the referral was made;

c. any objective documentation of the reasons for referral in language they can understand;

d. their rights to participate in the assessment and decision-making process of the team;

e. their right to examine relevant records with respect to such assessment, including the instruments themselves and the procedures to be used;

f. their right to stop the assessment process at any time by written notice; and

g. the Board of Education's right to request an impartial hearing to proceed with the assessment.

3.2 The assessment process shall be discussed with parents in the language spoken by parents in the home. Translators shall be used when needed and their use noted in the case record. Assessment personnel should be sensitive to misunderstandings that might result from linguistic differences.

3.3 The Division of Special Education shall establish and distribute procedures to determine when a student needs to be interviewed in an other than English language.

3.4 When a student needs to be interviewed in an other than English language, the interview shall be conducted by assessment personnel fluent in that language. When such personnel are unavailable and efforts to obtain them have been documented, a qualified translator shall be used. When a translator is used, the use shall be documented in the case record.

3.5 Assessment procedures to be used shall be centrally reviewed and recommended by the Division of Special Education, and distributed to assessment and other relevant personnel.

3.6 Assessment personnel shall assure that there is a descriptive statement in the assessment reports regarding the stated referral problem.

3.7 When the stated referral problem or the problem identified by assessment personnel is behavioral, the assessment reports shall include descriptions of the student's behavior as it relates to the problem, the frequency of the behavior, and, unless clearly unnecessary, the comparable behavior of other students in the classroom.

3.8 Assessments shall provide information clearly relevant to the stated referral problem or problem identified by assessment personnel. Assessment information shall be in a form useful for decisions that need to be made for the provision of instructional and related services, including all reviews and re-evaluations.

3.9 Assessment records shall include at least the following information: date, times, setting, name and title of person(s) collecting the information.

3.10 Assessment personnel shall collect several types of information (such as school records, direct observations, test scores, self reports).

3.11 Assessment personnel shall collect information which describes, in terms of observable behavior, areas of the student's strength and competence as well as areas of problems and weaknesses.

3.12 Assessment personnel shall collect information indicating the referred student's strengths and weaknesses from persons who interact frequently with the student.

3.13 Assessment personnel shall collect information about the interaction between the target student and peer(s), teacher(s) and others whenever relevant to the problem which generated the referral. The collection of this information shall be a part of systematic observational procedures that are directly related to specific questions generated by the referral problem.

3.14 At least one member of the assessment team shall conduct at least one structured observation of the student in the primary setting. The team member shall describe the results of this observation in the record.

3.15 When the presenting problem is behavioral, the assessment team is encouraged, consistent with their professional judgment, to conduct any or all of the following observations: (a) more than one structured observation of the student in the primary setting, (b) at least one structured observation of the student in at least one setting other than the primary setting, (e.g. other subject class, gym, lunch room), (c) structured observations in the primary setting by at least two assessment team members. If the presenting problem is behavioral and the assessment team conducts only one structured observation of the student in the primary setting, the assessment team shall state in the record the reason for not conducting additional observations.

3.16 Assessment personnel shall not employ assessment procedures beyond their stated purpose. If an assessment procedure is used beyond its stated purpose, the assessment personnel shall state why there are extraordinarily compelling circumstances which require its use and shall provide a written description of how the procedure was used and shall include that in the student's folder.

3.17 When selecting assessment instruments or procedures, whether in cognitive, emotional, or behavior areas, assessment personnel shall vigorously scrutinize available norms regarding their appropriateness. For standardized tests, if appropriate norms are not available, the information collected shall be of a descriptive nature.

3.18 When standardized tests or structured observations are employed, standard procedures must be followed.

3.19 Projective tests may provide descriptive information relevant in answering questions about the student's fantasy, motivation and reality testing. However, they should be used cautiously and with sensitivity to the individual student's linguistic, cultural and ethnic background.

3.20 Assessment personnel shall collect the referred student's self-reports of their thoughts and feelings in response to natural situations or standard stimuli, where appropriate, but extreme caution shall be exercised in their interpretation.

3.21 Assessment personnel shall collect information to rule out to the extent possible sensory or cognitive difficulties as the primary explanation of the stated referral problem or problem identified by assessment personnel.

3.22 Assessment personnel shall collect information to rule out to the extent possible linguistic, cultural or ethnic differences as the primary explanation of the stated referral problem or problem identified by assessment personnel.

3.23 Where appropriate, assessment personnel shall make recommendations for intervention which shall be tried, evaluated and documented in the present placement before completion of the assessment, if they are feasible, within applicable time limits.

## 4. CLASSIFICATION AND PLACEMENT

4.1 On request by parents, the School Based Support Team (SBST) or the District Subcommittee on the Handicapped shall provide copies of the written reports (psychological, educational evaluation, social history, etc.) before the Educational Planning Conference and/or District Subcommittee on the Handicapped review.

4.2 The SBST or the District Subcommittee on the Handicapped shall provide parents with copies of the Individualized Education Program and all required notices.

4.3 The SBST or the District Subcommittee on the Handicapped shall provide parents of limited English proficiency who speak major languages with written translations of the Individualized Education Program and all required notices. On request of the parent, oral translations of the assessment reports shall be provided.

4.4 The SBST or the District Subcommittee on the Handicapped shall inform parents of their right to have an advocate present at the Education Planning Conference or District Subcommittee on the Handicapped review.

4.5 The SBST or the District Subcommittee on the Handicapped shall not consider a case without having documented that the student's parents were informed of their rights to participate, to have an advocate accompany them at the meeting and an interpreter present if necessary.

4.6 A member of the assessment team shall be present when the District Subcommittee on the Handicapped meets to review assessment information when there is a disagreement between the SBST and the parent or upon request of the parent, a member of the assessment team or a member of the District Subcommittee on the Handicapped.

4.7 All information deriving from assessment procedures shall be considered when assessment personnel decide whether a student has a handicapping condition. The SBST or District Subcommittee on the Handicapped shall state the primary reasons for its classification and program/service category decision.

4.8 The SBST or the District Subcommittee on the Handicapped shall not make classification and placement decisions on the basis of the race or ethnic group of the student.

4.9 The SBST or the District Subcommittee on the Handicapped shall discuss the role of cultural and/or linguistic factors related to the stated referral problem or problem identified by assessment personnel, as well as other possible explanations for the student's behavior before determining if special education services are required. The substance of the discussion shall be noted in the record.

4.10 Before a student is classified as handicapped and in need of special education, assessment personnel shall be satisfied that there are no alternatives within the regular education system which would appropriately serve the student's needs.

4.11 Decisions regarding a handicapping condition shall be made only when the SBST or the District Subcommittee on the Handicapped are satisfied that the information is accurate, complete and appropriate. In reaching their decision, the assessment personnel shall make every effort to respond to parental concerns as to the accuracy, completeness and appropriateness of the information.

4.12 The SBST or District Subcommittee on the Handicapped should seek consensus on eligibility and placement decisions. If there is a significant dissenting opinion, the team or committee member(s) holding such opinion may enter in the record a clear statement of the basis for the dissenting opinion(s).

4.13 The SBST or the District Subcommittee on the Handicapped shall not classify a student as emotionally disturbed as a result of a single incident. However, some behavior is so intense and dangerous to self and/or others that infrequent, or even single, occurrences may be of great importance.

4.14 In order to classify a student as handicapped, the SBST or the District Subcommittee on the Handicapped shall rely on evidence which indicates that the handicapping condition interferes with the student's ability to function effectively in a regular education placement. In all subsequent considerations of classification and/or program placement, the SBST or the District Subcommittee on the Handicapped shall consider whether the student could function effectively in a less restrictive environment.

4.15 The SBST or the District Subcommittee on the Handicapped shall not classify a student as emotionally disturbed based solely on the results of projective testing.

4.16 When a student is classified as emotionally disturbed and placed in public or private special education programs, the SBST or the District Subcommittee

on the Handicapped shall have documented the evidence which indicates that a persistent pattern of maladjustive behavior interferes with the student's ability to function effectively in his or her present placement. In all subsequent considerations of classification and/or program placement, the SBST or District Subcommittee on the Handicapped shall consider whether the student could function effectively in a less restrictive environment.

4.17 The SBST or the District Subcommittee on the Handicapped shall make program and placement recommendations to meet the student's individual educational and related service needs in the least restrictive environment. Program and placement recommendations shall not be made on the basis of program and service availability.

4.18 Every SBST or District Subcommittee on the Handicapped shall develop a Phase One IEP, which provides for the educational and related service needs of the student. Every District Subcommittee on the Handicapped shall have available information about program sites which shall provide the services required by the IEP.

4.19 If a student is classified as emotionally disturbed, the SBST or the District Subcommittee on the Handicapped shall specify in the student's IEP the behavioral changes which are expected as a result of special education and related services, as well as specifying academic goals to be met through special education. Recommended approaches for effecting behavioral changes shall also be included in the annual goals on the student's Phase One IEP.

4.20 The SBST or the District Subcommittee on the Handicapped shall document how and why the services provided by the recommended program/services category will meet the objectives of the student's IEP.