## In re GRAND JURY SUBPOENA (PSYCHOLOGICAL TREATMENT RECORDS).

### Misc. No. 88–75.

United States District Court,
D. New Jersey.

April 4, 1989.

George E. Wilson, Sp. Atty., U.S. Dept. of Justice, Camden, N.J.

J. Stephen Woodside, Gary Green, Christopher D. Mannix, Sidkoff, Pincus & Green, P.C., Cherry Hill, N.J.

## OPINION

GERRY, Chief Judge.

## I. INTRODUCTION

This case involves a motion to quash a subpoena issued to the corporation under which a licensed psychologist operates his practice. The subpoena seeks appointment books, billing records, and notes of treatment relating to one of the psychologist's patients. The subpoena is objected to insofar as it requests the production of notes of treatment which may contain confidential communications made by the patient during psychotherapy. Such communications, the movant asserts on behalf of its patient, are shielded by the psychotherapist-patient privilege.

This privilege, like the physician-patient privilege, was unknown at common law. However, under Rule 501 of the Federal Rules of Evidence, the federal common law analysis is not determined by the prior existence or non-existence of the privilege at common law. Hence, the court must consider two primary issues: (1) whether a psychotherapist-patient privilege protecting the confidential communications of psychotherapy patients should be recognized as a matter of federal common law and (2) if so, whether it applies to the documents sought by the grand jury's subpoena.

## II. FACTUAL BACKGROUND

The challenged subpoena was issued by a federal grand jury investigating allegations of possible criminal activity by certain health care providers, including physicians and psychologists, as well as attorneys. According to the Special Attorney of the United States Department of Justice assisting the grand jury,[1] the allegedly criminal activity consists in the generation and provision of "inflated and fraudulent bills to more than twenty-six casualty insurance companies in support of fraudulent insurance claims for personal injury and medical expenses." Wilson Affidavit, ¶ 2.

The present grand jury investigation is closely related to a prior federal grand jury investigation of certain activities by a New Jersey law firm ("the law firm"). During that investigation, a search warrant was issued by United States Magistrate Jerome B. Simandle allowing the United States to seize and review certain of the law firm's files, subject to carefully crafted protective procedures. The legality of the warrant was subsequently upheld by the United States Court of Appeals for the Third Circuit. *In re Impounded Case (Law Firm)*, 840 F.2d 196 (3d Cir.1988).

The affidavit which accompanied the warrant request established that there was probable cause to believe that the law firm, which is primarily engaged in the representation of plaintiffs in personal injury litiga-

---

1. Our recitation of the facts is derived from the sworn submissions of this attorney, which consist of a *Schofield* affidavit, *In re Grand Jury Proceedings (Schofield I)*, 486 F.2d 85 (3d Cir. 1973); *In re Grand Jury Proceedings (Schofield II)*, 507 F.2d 963 (3d Cir.), *cert. denied,* 421 U.S. 1015, 95 S.Ct. 2424, 44 L.Ed.2d 685 (1975), and a sworn fact section of the United States' opposition brief to the motion to quash and the exhibits attached thereto. Both are based on personal knowledge of the information before the grand jury. No opposing affidavits have been filed which contradict the facts asserted therein. Moreover, at a record hearing conducted in chambers with movant's counsel present, the court probed the information on which the affidavits were based. This information included: (1) voluminous insurance files, (2) psychological profiles issued by the target of the subpoena to a law firm being investigated by the grand jury, and (3) the testimony of a large number of the law firm's clients who were sent to the psychologist by the law firm.

tion, had violated the federal criminal law prohibiting mail fraud [2] by, *inter alia*, inflating the medical bills of its clients by securing false statements from physicians regarding the number of visits the clients made to these physicians. These statements were then mailed to insurance companies for use as a basis for settlement of these clients' personal injury suits. The search warrant allowed the United States to seize files specially marked to indicate that a fraudulent doctor's report was contained therein.

Here, the grand jury has issued a subpoena for certain records of a corporation ("P–Corp"), under whose name a licensed psychologist of the State of New Jersey ("the psychologist") conducts his psychotherapeutic practice.[3] The subpoena calls for the production of all treatment and billing records possessed by P–Corp pertaining to a lawyer ("the lawyer"), a partner in the law firm, who was allegedly treated by the psychologist.[4]

These records relate to the grand jury's investigation in the following manner. On June 1, 1983, the lawyer was involved in a rear-end automobile collision when he stopped his car suddenly and was hit from behind. After the accident there was no apparent damage to the lawyer's car, nor did the lawyer complain that he was injured, according to the driver of the other car involved in the accident.

After the accident, the lawyer filed two insurance claims. The first was filed with the United Services Automobile Association, the lawyer's insurance carrier, and requested a payment of $4,836.88. The sum reflected wages the lawyer allegedly lost as a result of the accident, $800.00 for 10 psychotherapy sessions at P–Corp, and $960.00 for 27 visits to a physician. The second claim was filed with the other driver's insurance company, the General Accident Insurance Company, and asked for $35,000 as payment for pain and suffering caused by the accident. When this claim was rejected, the lawyer instituted a tort action in the Superior Court of New Jersey. The case was dismissed after the lawyer obtained a $12,500 settlement.

The grand jury has developed information leading it to suspect that these claims for medical and psychotherapeutic services were fraudulent. Apparently, of the 70 potentially fraudulent insurance claims the grand jury has linked to this firm, approximately one-third of the cases were assigned to the lawyer. Moreover, the grand jury's information is that this psychologist routinely provided clients of the law firm with psychological reports diagnosing various psychological maladjustments resulting from automobile accidents in which these clients were involved. These diagnoses are supposedly boiler-plate reports which contain recitations of various maladies.[5] Virtually all relate to persons involved in low-

**2.** 18 U.S.C. § 1341.

**3.** The day before the hearing movant raised the objection that P–Corp could not produce the requested materials because only the psychologist could do so. No legal authority or factual evidence was presented supporting this argument, nor was it originally, i.e., in the motion to quash, asserted as a reason to quash the subpoena. In any case, at the hearing, P–Corp's counsel stated that, at the time the documents in question were produced, the psychologist was the only stockholder, officer, and employee of P–Corp. Recently, an identical subpoena has been issued to the psychologist himself. The court's opinion on the psychologist's motion to quash that subpoena is appended to this opinion.

**4.** The subpoena also calls for the production of all of P–Corp's appointment books for 1982 and

1983. The United States has indicated that this request should be amended to include only those appointment books which relate to the lawyer. Any information relating to other patients may be redacted. We rely on this representation in ruling on this motion.

In addition, the movant originally sought to shield all the requested documents by operation of the privilege. At oral argument, movant's counsel indicated that it was really the notes of treatment which he sought to protect from disclosure. Our discussion presumes that if the notes of treatment are not privileged, neither are the other records which contain no confidences.

**5.** A copy of the report the psychologist produced regarding the lawyer's psychological condition following the accident was placed in the record during the court's hearing on the motion to quash.

speed "fender-benders" in which the law firm/P–Corp clients suffered soft-tissue injuries such as aches and strains.

To determine whether P–Corp's bill for services provided to the lawyer was inflated, and whether the lawyer was actually treated by the psychologist, and if so, whether the treatment was impelled by the June 1, 1983 accident or some other reason, the grand jury seeks to examine P–Corp's records relating to its treatment of the lawyer. P–Corp did not originally challenge the sufficiency of the affidavit supporting the subpoena; however, it did raise such an objection shortly before the court's hearing on this matter. The court is unpersuaded by this argument.[6] P–Corp's central argument is that the notes of treatment sought by the grand jury are privileged, and that the patient has not waived the privilege and is relying on the psychologist and P–Corp to assert it on his behalf. The United States does not challenge P–Corp's standing to do so, in light of its possession and ownership of certain of the records, the status of the movant as a subject of the investigation, and the traditionally accepted practice of physicians and/or psychologists asserting the privileges held by their patients.[7] Therefore, we turn our attention to this issue.

## III. LEGAL ANALYSIS

The starting point for our consideration of whether a psychotherapist-patient privilege shields the evidence sought by the subpoena is Federal Rule of Evidence 501, see Fed.R.Evid. 1101(d)(2), which provides:

Except as otherwise required by the Constitution of the United States or provided by Act of Congress or in rules prescribed by the Supreme Court pursuant to statutory authority, *the privilege of a witness, person, government, State or political subdivision thereof shall be governed by the principles of the common law as they may be interpreted by the courts of the United States in the light of reason and experience.* However, in civil actions and proceedings, with respect to an element of a claim or defense as to which State law supplies the rule of decision, the privilege of a witness, person, government, State or political subdivision thereof shall be determined in accordance with State law.

Fed.R.Evid 501 (emphasis added).

The pertinent language comports with the practice under prior Rule 26 of the Federal Rules of Criminal Procedure. 2 J. Weinstein & M. Berger, *Weinstein's Evidence* ¶ 501[02]–[03], at 501–19 to 34 (1988) [hereinafter *Weinstein's Evidence* ]; *United States v. Panetta*, 436 F.Supp. 114, 125 (E.D.Pa.1977), *aff'd without opinion*, 568 F.2d 771 (3d Cir.1978). While the issue before us concerns a grand jury subpoena and not a request for evidence or testimony in a criminal trial, no reason suggests itself why different rules of privilege should apply to proceedings which are both necessary to the effective enforcement of federal criminal law.

When Congress adopted the Federal Rules of Evidence, it rejected several specific privileges proposed by the Supreme Court, including Proposed Rule of Evidence

---

**6.** The movant raised a *Schofield* objection in its reply brief filed the Wednesday afternoon prior to our Friday hearing. *Schofield* requires the government to make a showing by affidavit that the subpoenaed items are: "(1) relevant to an investigation, (2) properly within the grand jury's jurisdiction, and (3) not sought primarily for another purpose." *Shofield II*, 507 F.2d at 966.

The supplemental submission of the government, which contains a sworn fact section, as well as the representations made on the record by the government, defeats any *Schofield* claim. The subpoenaed items are clearly relevant to the grand jury's investigation of possible violations of the federal mail fraud laws. They will pro-

vide the government with the only direct evidence it may be able to obtain about whether the lawyer-psychologist relationship was designed to perpetrate fraud, rather than facilitate treatment. The psychologist has already refused to testify before the grand jury and is a "subject" of its investigation, and, of course, the laweyr himself is already a full-fledged "target".

Moreover, there has been no challenge to the government's assertion that it wants the required items for the clearly proper and relevant purpose of investigating this possible mail fraud violation, a matter well within its jurisdictional purview.

**7.** *See* appended opinion at typescript 40–41.

504, which embodied a narrowly crafted psychotherapist-patient privilege, in favor of the present Rule 501. By so doing "Congress manifested an affirmative intention not to freeze the law of privilege. Its purpose rather was to provide the courts with the flexibility to develop rules of privilege on a case-by-case basis, and to leave the door open to change." *Trammel v. United States*, 445 U.S. 40, 47, 100 S.Ct. 906, 910, 63 L.Ed.2d 186 (1980); *see also United States v. Gillock*, 445 U.S. 360, 367, 100 S.Ct. 1185, 1190, 63 L.Ed.2d 454 (1980) (Rule 501 was substituted by Congress to give the courts "greater flexibility in developing rules of privilege on a case-by-case basis."). As such, the common law's failure to recognize the privilege is not determinative.

Nevertheless, while this court has the authority to recognize a psychotherapist-patient privilege in the grand jury context, *Trammel*, 445 U.S. at 47, 100 S.Ct. at 910, this authority must be exercised with prudence because evidentiary privileges are not favored since "they are in derogation of the search for the truth." *United States v. Nixon*, 418 U.S. 683, 711, 94 S.Ct. 3090, 3109, 41 L.Ed.2d 1039 (1974) (quoted in *In re Zuniga*, 714 F.2d 632, 638 (6th Cir.) *cert. denied*, 464 U.S. 983, 104 S.Ct. 426, 78 L.Ed.2d 361 (1983)). Most importantly, evidentiary privileges must be "strictly construed and accepted only to the very limited extent that permitting a refusal to testify or excluding relevant evidence has a public good transcending the normally prudent principle of utilizing all rational means for ascertaining truth." *Trammel*, 445 U.S. at 50, 100 S.Ct. at 912 (citations and quotations omitted). Thus, the evaluation of whether a new privilege is justified "by the principles of the common law ... interpreted ... in the light of reason and experience" will depend on the balance the court strikes between the interests supported by the asserted privilege and those served by the production of relevant evidence. *Weinstein's Evidence* ¶ 501[03], at 501–33 to 34.

In a recent decision, the Court of Appeals for the Third Circuit indicated that district courts grappling with an assertion of privilege under Federal Rule of Evidence 501 should undertake a two-step analysis. *In re Grand Jury (Granite Purchases)*, 821 F.2d 946, 955 (3d Cir.1987), *cert. denied*, —— U.S. ——, 108 S.Ct. 749, 98 L.Ed.2d 762 (1988). The analysis requires the court to "first decide whether a qualified privilege exists or should exist before deciding how to apply it to a particular case." *Id.* at 955. The justification for this process was well-stated in Judge Becker's opinion for the Court:

> By insisting on a two-step process, courts guide their discretion with rules developed from accumulated wisdom about the situations that justify a privilege. The requirement of general privilege rules also enables private actors to rely on those rules and thereby to engage more freely in the conduct privileges aim to encourage. Thus, although the concept of the qualified privilege permits courts to uphold or reject privilege claims in light of the particulars of an individual case, the decision to recognize a qualified privilege must still follow from a more broad-based view of how the privilege will work in general.

*Id.*

While this analysis may involve a necessary balancing of interests, weight may be placed on the side of an asserted privilege only after the court determines that the privilege is supported by a specific justification "for courts should apply privileges 'only to the extent necessary to achieve their purpose.'" *Id.* at 955 (quoting *In the Matter of Grand Jury Impaneled January 21, 1975 (Freedman & Cortese)*, 541 F.2d 373, 382 (3d Cir.1976)).

That is, we are required, as an initial matter, to analyze whether a psychotherapist-patient privilege of some form furthers sufficiently important and overriding interests so that recognition of the privilege is appropriate under Rule 501. If a privilege is recognized, we must then decide whether factors specific to the case before us dictate that the privilege must give way. We are aware that privileges do not confer "absolute" or "unqualified" immunity upon

their holders.[8] *Lora v. Board of Educ.*, 74 F.R.D. 565, 577 (E.D.N.Y.1977) (Weinstein, J.); *later proceeding*, 456 F.Supp. 1211 (E.D.N.Y.1978), *vacated on other grounds*, 623 F.2d 248 (2d Cir.1980), *on rem.*, 587 F.Supp. 1572 (E.D.N.Y.1984).

And though this balancing of interests seems incongruously legislative in nature, we take some solace in the congressional intent which underlies Rule 501 and in the fact that our task is by no means alien to us. For "as in most other areas of the law, we must engage in the delicate task of weighing competing interests." *United States v. Westinghouse Elec. Corp.*, 638 F.2d 570, 578 (3d Cir.1980).

### A. *How the Privilege Generally Operates*

The decision to recognize a psychotherapist-patient privilege must flow from a "broad-based view of how the privilege will work in general." *Granite Purchases*, 821 F.2d at 955. To inform this aspect of our analysis, both the movant and the government point to the original draft of the Federal Rules of Evidence.

The Federal Rules of Evidence as promulgated by the United States Supreme Court on November 20, 1972, and as sent to the Congress on February 5, 1973, contained a psychotherapist—patient privilege in Proposed Rule 504. Though Congress did not adopt this rule, its contours are still useful in considering whether a psychotherapist-patient privilege should be adopted as a matter of federal common law, *Lora*, 74 F.R.D. at 584, and suggestive of what form such a privilege might take.

Proposed Rule 504 provided:

**(a) Definitions.**

(1) A "patient" is a person who consults or is examined or interviewed by a psychotherapist.

(2) A "psychotherapist" is (A) a person authorized to practice medicine in any state or nation, or reasonably believed by the patient so to be, while engaged in the diagnosis or treatment of a mental or emotional condition, including drug addiction, or (B) a person licensed or certified as a psychologist under the laws of any state or nation, while similarly engaged.

(3) A communication is "confidential" if not intended to be disclosed to third persons other than those present to further the interest of the patient in the consultation, examination, or interview, or persons reasonably necessary for the transmission of the communication, or persons who are participating in the diagnosis and treatment under the direction of the psychotherapist, including members of the patient's family.

**(b) General rule of privilege.** A patient has a privilege to refuse to disclose and to prevent any other person from disclosing confidential communications, made for the purposes of diagnosis or treatment of his mental or emotional condition, including drug addiction, among himself, his psychotherapist, or persons who are participating in the diagnosis or treatment under the direction of the psychotherapist, including members of the patient's family.

**(c) Who may claim the privilege.** The privilege may be claimed by the patient, by his guardian or conservator, or by the personal representative of a deceased patient. The person who was the psychotherapist may claim the privilege but only on behalf of the patient. His authority so to do is presumed in the absence of evidence to the contrary.

**(d) Exceptions.**

(1) **Proceedings for hospitalization.** There is no privilege under this rule for communications relevant to an issue in proceedings to hospitalize the

---

**8.** While there is no doubt that Congress could, and many state legislatures do, fashion privileges which may give way only in certain specified situations, this court is chary to fashion an absolute privilege subject only to certain narrow exceptions. This would be inconsistent with Congress' desire for an evolutionary development of the federal law of privileges, an evolution which is to occur by the careful evaluation of asserted privileges in the context of concrete disputes. Moreover, this court's discomfiture at performing what is essentially a legislative task informs this modesty.

patient for mental illness, if the psychotherapist in the course of diagnosis or treatment has determined that the patient is in need of hospitalization.

**(2) Examination by order of judge.** If the judge orders an examination of the mental or emotional condition of the patient, communications made in the course thereof are not privileged under this rule with respect to the particular purpose for which the examination is ordered unless the judge orders otherwise.

**(3) Condition an element of claim or defense.** There is no privilege under this rule as to communications relevant to an issue of the mental or emotional condition of the patient in any proceeding in which he relies upon the condition as an element of his claim or defense, or after the patient's death, in any proceeding in which any party relies upon the condition as an element of his claim or defense.

Though we need not do so, we accept the general outline of Proposed Rule 504 as indicative of how a psychotherapist-patient privilege would operate in federal law. The Proposed Rule evinces a belief that the benefits reaped by privileging confidential communications made during psychotherapy exceed any cost the privilege imposes as a result of the loss of relevant evidence, except in three circumstances. It is this assumption which this court, to the extent it is able, must test. The movant has not contested the desirability of these exceptions, and, therefore, we assume that they have vitality for purposes of this motion. While recognizing Proposed Rule 504 as a general guide, however, this court believes that further exceptions to the general operation of the privilege might well be indicated in the light of reason and experience.[9] We turn now to the interests supposedly furthered by the privilege.

### B. *Interests Served by the Privilege*

The psychotherapist-patient privilege is said to serve principally two functions. *Developments in the Law—Privileged Communications*, 98 Harv.L.Rev. 1450, 1452–1548 (1985) [hereinafter *Developments*]. The first, and traditionally the most emphasized, function is to provide a sufficiently certain guarantee of confidentiality so that persons engaged in psychotherapy will feel secure enough to communicate freely during therapy and so those experiencing emotional distress or suffering from mental illness are not discouraged from seeking treatment. *Id.* at 1542.

The second function served by the privilege is the protection of the privacy of psychotherapy patients. Many potentially embarrassing and intensely personal communications are made, and are expected to be made, during psychotherapy. Governmentally coerced exposure of the thoughts and emotions expressed by persons in the context of a confidential therapeutic relationship implicates constitutionally protected areas of privacy. *Id.* at 1545–48.

#### 1. Fostering Effective Treatment

The justification for Rule 504 rested on its purported role in fostering effective treatment:

> Among physicians, the psychiatrist has a special need to maintain confidentiality. His capacity to help his patients is completely dependent upon their willingness and ability to talk freely. This makes it difficult if not impossible for him to function without being able to assure his patients of confidentiality and, indeed, privileged communication. Where there may be exceptions to this general rule ..., there is wide agreement that confidentiality is a *sine qua non* for successful psychiatric treatment. The relationship may well be likened to that of the priest-penitent or the lawyer-client. Psychiatrists not only explore the very depths of their patients' conscious, but their unconscious feelings and attitudes

---

**9.** Not implicated by this case are questions such as whether the privilege, if recognized, should extend to confidences communicated to professionals performing roles similar to psychotherapists, such as social workers, *see In re Produc-* *tion of Records to Grand Jury*, 618 F.Supp. 440 (D.Mass.1985) (recognizing a qualified social worker patient privilege), or to shield the mere fact that an individual was a psychotherapy patient.

as well. Therapeutic effectiveness necessitates going beyond a patient's awareness and, in order to do this, it must be possible to communicate freely. A threat to secrecy blocks successful treatment.

Report No. 45, Group for the Advancement of Psychiatry 92 (1960) (quoted in Advisory Committee's Note to Proposed Fed.R.Evid. 504, 56 F.R.D. 183, 242 (1973)).

Another oft-quoted statement of this rationale for the privilege was rendered by the United States Court of Appeals for the District of Columbia:

In regard to mental patients, the policy behind such a statute is particularly clear and strong. Many physical ailments might be treated with some degree of effectiveness by a doctor whom the patient did not trust, but a psychiatrist must have his patient's confidence or he cannot help him. "The psychiatric patient confides more utterly than anyone else in the world. He exposes to the therapist not only what his words directly express; he lays bare his entire self, his dreams, his fantasies, his sins, and his shame. Most patients who undergo psychotherapy know that this is what will be expected of them, and that they cannot get help except on that condition. * * * It would be too much to expect them to do so if they knew that all they say—and all that the psychiatrist learns from what they say—may be revealed to the whole world from a witness stand."

*Taylor v. United States,* 222 F.2d 398, 401 (D.C.Cir.1955), (footnote omitted) (quoting Gutmacher & Weihofen, *Psychiatry and the Law* 272 (1952)).

This necessity for free, and extraordinarily intimate, communications, combined with the social stigma unfortunately still attached to psychotherapy, convinced the Advisory Committee and the Supreme Court to favor a psychotherapist-patient privilege at the same time they were opposing a general physician-patient privilege. Thus, the Rules as promulgated by the Supreme Court contained no general physician-patient privilege. *See* Advisory Committee's Note to Proposed Fed.R.Evid. 504,

56 F.R.D. at 242. (rejecting a physician-patient privilege because "the exceptions [to such a privilege] which have been found necessary in order to obtain information required by the public interest or to avoid fraud are so numerous as to leave little if any basis for the privilege"). The supposed distinction between the two privileges has been succinctly stated by Judge Weinstein:

[U]nlike the patient with physical complaints who will consult a physician regardless of whether confidentiality is guaranteed, a neurotic or psychotic individual may seek help only if he is assured that his confidences will not be divulged, even in a courtroom.

*Lora,* 74 F.R.D. at 575; *see also Weinstein's Evidence,* ¶ 504[03], at 504–15 to 16; E. Cleary, *McCormick's on Evidence* § 99, at 213 n. 9 (2d ed. 1972). *But see Developments, supra,* at 1448–50 (criticizing as oversimplified the distinctions drawn between the two privileges).

An extremely thorough review of the law of privileges concluded that there is no authoritative empirical evidence which proves or disproves the proposition that the existence of a psychotherapist-patient or physician-patient privilege encourages persons to seek treatment and to freely communicate within these relationships. *Developments, supra,* at 1474–77, 1542–44. It has been, however, suggested that the "relevant question is not whether too few people know of a privilege, but whether enough people would become aware of (and act on) its absence." *Id.* at 1475. And merely because empirical data are lacking, we should not assume the asserted benefits flowing from the privilege are non-existent when the costs imposed by the existence of the privilege are no more certain. *Id.* at 1477–79.

This lack of empirical proof does not obviate our duty to decide the issue before us, and we find the argument that the psychotherapist-patient privilege fosters the effective use of psychotherapy intuitively appealing. Widespread knowledge that what is exposed in private to a psychotherapist might well be involuntarily ex-

posed to the world would, in this court's view, have but an inhibiting effect, however small or large, on those thinking about entering psychotherapy and those already attempting to help themselves through such treatment. Certainly society has an interest in furthering the availability and use of such treatment if this can be done without undue frustration of other societal interests. The privilege facilitates this interest by assuring that patient confidences are not routinely revealed in litigation.

### 2. Privacy Interests of the Patient

■ The Fourteenth Amendment of the United States Constitution protects at least two aspects of personal privacy. "One is the individual interest in avoiding disclosure of personal matters, and another is the interest in independence in making certain kinds of important decisions." *Whalen v. Roe*, 429 U.S. 589, 599–600, 97 S.Ct. 869, 876–877, 51 L.Ed.2d 64 (1977); *Westinghouse Elec. Corp.*, 638 F.2d at 577.[10] The first of the interests is clearly affected by the recognition or non-recognition of a psychotherapist-patient privilege. Reason suggests that the second interest, which traditionally concerns decisions regarding "matters relating to marriage, procreation, contraception, family relationships, and

child rearing and education," *Paul v. Davis*, 424 U.S. 693, 713, 96 S.Ct. 1155, 1166, 47 L.Ed.2d 405 (1976); *Westinghouse*, 638 F.2d at 577, is also implicated where the government acts in a way which interferes with a person's "independence in making those choices that may seriously effect personal physical or mental health—specifically, the right to be free to seek benefit from psychotherapeutic counseling." *Lora*, 74 F.R.D. at 570.

Both of these privacy interests interact in the context of psychotherapy, for, as it has been eloquently stated:

Psychologically ... privacy is a two-way street consisting not only of what we need to exclude from or admit into our own thoughts or behavior but also of what we need to communicate to, or keep from, others. Both of these conflicting needs, in mutually supportive interaction, are essential to the well-being of individuals and institutions, and any definition of privacy, or of private personality, must reflect this plastic duality; sharing and concealment.

Ruebhausen & Brim, *Privacy and Behavioral Research*, 655 Colum.L.Rev. 1184, 1188–89 (1965) (footnote omitted) (quoted in *Lora*, 74 F.R.D. at 570–71.) The absence of some form of psychotherapist-patient

---

**10.** The Court of Appeals for the Third Circuit has articulated factors to guide courts in deciding whether the government may, consistently with the Fourteenth Amendment, intrude upon a patient's privacy interest in his medical files. These factors include:

> ... the type of record requested, the information it does or might contain, the potential for harm in any subsequent nonconsensual disclosure, the injury from disclosure to the relationship in which the record was generated, the adequacy of safeguards to prevent unauthorized disclosure, the degree of need for access, and whether there is an express statutory mandate, articulated public policy, or other recognizable public interest militating toward access.

*In re Search Warrant (Sealed)*, 810 F.2d 67 at 72 (3d Cir.1987), (quoting *Westinghouse Elec. Corp.*, 638 F.2d at 578). No Fourteenth Amendment claim has been raised here (though aspects of our privilege analysis are similar to that required by *Westinghouse*) and therefore we will not unnecessarily engage in a constitutional analysis. The similarity of the *Westinghouse* analysis to the Rule 501 analysis raises, how-

ever, the question of whether recognition of a psychotherapist-patient would be superfluous.

This court's answer is no. We take it that Rule 501 allows courts to fashion privileges more protective than the Constitution, otherwise, all privilege questions governed by federal law would be of constitutional dimension and Rule 501 would be unnecessary. Moreover, by mixing the analyses and grounding the privilege in the Constitution, the privilege would be frozen as "a constitutional form not amenable to change by rule, statute, or further case-law development." *United States v. Talley*, 790 F.2d 1468, 1470 (9th Cir.1986) (quoting *United States ex rel. Edney v. Smith*, 425 F.Supp. 1038, 1054 (E.D.N.Y.1976), *aff'd*, 556 F.2d 556 (2d Cir. 1977), *cert. denied*, 431 U.S. 958, 97 S.Ct. 2683, 53 L.Ed.2d 276 (1977)). This would be inconsistent with Rule 501's mandate to develop the law of privilege "in the light of reason and experience," on a case-by-case basis. As Judge Weinstein notes, psychotherapist—patient privilege is not a well-developed area of law and "it appears inappropriate and unwise at this stage to block potential areas of evolution." *Smith*, 425 F.Supp. at 1055.

privilege harms both of these interests. Persons wishing to confide in a psychotherapist, to expose their souls in the interest of their own mental health and happiness, may choose not to do so when such confidences might well find a much wider audience. And, of course, psychotherapy patients whose confidential communications are exposed in the course of litigation will often be humiliated and have their personal lives disrupted:

> Frequently, a patient in analysis will make statements to his psychiatrist which he would not make even to the closest members of his family. Slovenko, *Psychiatry and a Second Look at the Medical Privilege*, 6 Wayne L.Rev. 175, 184–185 (1960). Revelations often concern the most intimate and embarrassing details of patient's life, and their public exposure may well strip him of much of his own sense of human dignity.

*Lora,* 74 F.R.D. at 571. Furthermore, it has been recognized that a certain level of mental health is necessary if individuals are to enjoy other fundamental freedoms, such as those protected by the First Amendment, which also tinge on privacy interests. *In re Zuniga,* 714 F.2d at 639.

Our society, more perhaps than any other, values personal privacy. Many of the amendments to the Constitution, particularly the Fourth and the Fourteenth, are directed at setting limits on governmental intrusions into our lives. "It is indeed clear beyond peradventure that 'the Constitution embodies a promise that a certain private sphere of individual liberty will be kept largely beyond the reach of government.' " *In re Search Warrant (Sealed),* 810 F.2d 67, 71 (3d Cir.), *cert. denied,* 483 U.S. 1007, 107 S.Ct. 3233, 97 L.Ed.2d 739 (1987) (quoting *Thornburgh v. American College of Obstetricians,* 476 U.S. 747, 772, 106 S.Ct. 2169, 2185, 90 L.Ed.2d 779 (1986)).

This reverence for privacy is embedded in our law. Congress has acted in several areas to safeguard individual privacy. *Westinghouse,* 638 F.2d at 576–577; *Developments, supra,* at 1544–55. And several common law torts, such as invasion of privacy, trespass and defamation, are in essence recognitions of the premium our society places on privacy. *Developments, supra,* at 1544–45.

This court, candidly, places a high value on these privacy interests, and believes the protective benefits to be derived from the existence of the privilege to be substantial. The unnecessary and/or routine disclosure of personal confidences made in the course of psychotherapy is something we look upon with disfavor, and even distaste. Recognition of the privilege will provide reassurance to those among us who wish to express themselves in a secure and nurturing therapeutic relationship. Nonetheless, only if these benefits and society's interest in fostering effective psychotherapy outweigh the social cost of a psychotherapist-patient privilege, may we recognize it. Therefore, we turn our attention to the other side of the scale.

## C. *Interests Weighing Against the Privilege*

The interests weighing against recognition of a psychotherapist-patient privilege in the context of federal criminal grand jury investigations are weighty, but can be more briefly articulated. These interests consist primarily in the potential loss of evidence relevant to investigations which play a vital role in the effective enforcement of federal criminal law. All evidentiary privileges are, to some degree, at odds with the guiding theme of the Advisory Committee which drafted the Federal Rules of Evidence:

> In drafting rules of evidence, the Advisory Committee viewed as its paramount goal the admission of all relevant evidence so that the likelihood of accurate determinations would be increased. Rules of privilege, unlike most other evidence rules are not designed to achieve a more effective and truthful result in the litigation process. Consequently, the Advisory Committee, in accord with most modern commentators, viewed privileges as hindrances which should be curtailed.

*Weinstein's Evidence* ¶ 501[01], at 501–13; *see also McCormick's on Evidence* § 72, at 152 (Privileges "do not in any wise aid the

ascertainment of truth, but rather they shut out the light.").

And the need for evidence relevant to the truth-seeking process has been recognized as especially important in the context of federal grand jury investigations, which are mandated by the Fifth Amendment. *Branzburg v. Hayes*, 408 U.S. 665, 687, 92 S.Ct. 2646, 2659, 33 L.Ed.2d 626 (1972) ("The adoption of the grand jury 'in our Constitution as the sole method for preferring charges in serious criminal cases shows the high place it held as an instrument of justice.'") (quoting *Costello v. United States*, 350 U.S. 359, 362, 76 S.Ct. 406, 408, 100 L.Ed. 397 (1956)). "Because its task is to inquire into the existence of possible criminal conduct and to return only well-founded indictments, [a grand jury's] investigative powers are necessarily broad." *Id.* 408 U.S. at 688, 92 S.Ct. at 2660; *see also United States v. Dionisio*, 410 U.S. 1, 12–13, 93 S.Ct. 764, 770–71, 35 L.Ed.2d 67 (1973). Indeed, such is the importance of the federal interest in the enforcement of federal criminal statutes that the Supreme Court has indicated that any concern for federal-state comity in the area of evidentiary privilege must yield in the wake of this interest. *Gillock*, 445 U.S. at 373, 100 S.Ct. at 1193.

This court is cognizant that patients may disclose extraordinarily useful information during psychotherapy. A leader of an organized crime mob may disclose the secrets of his organization to his psychotherapist, and a "drug king-pin" may identify his cohorts during treatment. The psychotherapist—patient privilege would, generally, keep such information from grand juries despite its obvious usefulness in investigations of federal crime, so long as the communications were made to a psychothera-

pist confidentially in the interests of furthering treatment of the patient.[11]

## D. *Striking the Balance*

■ In essence, our inquiry under Rule 501 boils down to whether recognition of a psychotherapist-patient privilege "promotes sufficiently important interests [which] outweigh the need for probative evidence in the administration of criminal justice." *Trammel*, 445 U.S. at 51, 100 S.Ct. at 913. This court recognizes that the balance it strikes depends heavily on its own normative predilections, especially given the absence of reliable empirical evidence on this subject.[12] This much being acknowledged, this court believes that the interests served by a psychotherapist—patient privilege protective of confidential communications outweigh, in general, any hindrance the privilege would work upon the effectiveness of federal grand jury investigations.

Society, we feel, has a discernible interest in fostering the therapeutic treatment of those of its members experiencing emotional turbulence. This interest consists not only in our altruistic concern for our neighbors' well-being, but in our more selfish interest in the effective treatment of those in the community who may pose a threat because of mental illness or drug addiction. Logically, the existence of the privilege would encourage treatment; at the very least, the absence of a privilege seems likely to have at least some deterrent effect on those seeking treatment.

Equally important are the privacy rights of psychotherapy patients. There is something undoubtedly unseemly about requiring, as a matter of course, psychothera-

---

**11.** We also note the possibility that such utterances would not be made absent an assurance of confidentiality in the first place.

On the other hand, we also are aware that the invasion of a patient's privacy in the grand jury context is minimized by the secrecy of such proceedings. Fed.R.Crim.P. 6(e).

**12.** A empirical study of the psychotherapist patient concluded that:

For a small percentage of people the psychotherapist—patient privilege may have a

marked bearing on the efficacy of their therapy and in a small percentage of judicial proceedings the psychotherapist-patient privilege may have a marked bearing on the accuracy of proceedings. Which is more important? This question is not subject to empirical validation but calls instead for the weighing of values.

Shuman & Weiner, *The Privilege Study: An Empirical Examination of the Psychotherapist–Patient Privilege*, 60 N.C.L.Rev. 893, at 928 (1982).

pists to disclose the most intimate of their patients' thoughts and emotions, when such communications merely meet the broad relevancy requirements applicable to grand jury investigations. So long as the psychotherapeutic relationship was initiated and continued for the benefit of the patient's psychic health, federal common law should, in most instances, respect the integrity of this relationship. Such respect requires that federal courts lay bare a man's soul reluctantly, rather than routinely.

Furthermore, it is not at all certain that the recognition of the privilege will markedly impair many grand jury investigations. To the extent, for example, a grand jury seeks communications made by a "target" of its investigation and is frustrated by the privilege, the grand jury stands in the same position as most grand juries which are severely limited in the amount of evidence they may obtain out of targets' mouths. And of course, it will be only infrequently that communications made during therapy will in themselves constitute a crime, rather than evidence of a past crime in the form of a confession. When the psychotherapeutic relationship itself seems fraught with crime, the privilege, as discussed in detail below, need not frustrate federal law enforcement efforts since the justifications for the privilege would not be implicated.

Our conclusion finds support among several distinguished sources of authority. For example, the Advisory Committee which drafted the original Federal Rules of Evidence did not look favorably upon privileges in general yet considered a psychotherapist-patient privilege desirable. And while we have noted that its proposed rules are not binding they

> remain a convenient and useful starting point for examining questions of privilege. The standards are the culmination of three drafts prepared by an Advisory Committee consisting of judges, practicing lawyers, and academicians. In its seven years of work, the Committee considered hundreds of suggestions received in response to the circulation of the drafts throughout the legal community.

Finally, they were adopted by the Supreme Court by an eight to one vote. *Weinstein's Evidence,* ¶ 501[03], at 501–26.

Congress' refusal to adopt the specific privileges suggested by the Advisory Committee was not motivated by a dislike for a psychotherapist-patient privilege; indeed, Proposed Rule 504 was attacked as too narrow. *Id.* ¶ 501[01], at 501–15.

And while Congress has not enacted a psychotherapist—patient privilege it is of some significance that forty-five of our fifty states have chosen to enact some form of the privilege. *Developments, supra,* at 1539; *see also Zuniga,* 714 F.2d at 639 n. 9 (listing state statutes and rules.) All three states within the Third Circuit recognize the privilege. Del.Unif.R.Evid. 503 (1987); N.J.Stat.Ann. § 2A:84A–22.2 (West 1976) (physician-patient privilege); N.J.Stat.Ann. § 45:14B–28 (West 1978) (psychologist-patient privilege); 42 Pa.Cons.Stat.Ann. § 5929 (Purdon 1982) (physician-patient privilege); 42 Pa.Cons.Sta.Ann. § 5944 (Purdon 1982) (psychologist-patient privilege). This wide acceptance of the privilege suggests that the interests served by it are accepted as important by a large segment of the American body politic.

The United States Court of Appeals for the Sixth Circuit engaged in the appropriate analysis required under Rule 501, and reached a conclusion consistent with our own. In *In re Zuniga,* a case dealing with a grand jury subpoena seeking the production of certain of a psychiatrist's patient records, the court weighed the interests favoring a psychotherapist-patient privilege and found "that these interests, in general, outweigh the need for evidence in the administration of criminal justice." *In re Zuniga,* 714 F.2d at 639. It therefore concluded that a psychotherapist-patient privilege was mandated by reason and experience.

The United States Court of Appeals for the Eleventh Circuit has recently disagreed with *Zuniga's* conclusion and our own, but its decision was based on an inappropriate mode of analysis. In *United States v. Corona,* 849 F.2d 562 (11th Cir.1988), a defen-

dant stood convicted of, *inter alia*, violating 18 U.S.C. § 922(h)(3), which makes it unlawful for a user or addict of a controlled substance to receive firearms. Part of the evidence securing his conviction consisted of the testimony of a psychiatrist, in whom the defendant had confided about his cocaine use. On appeal the defendant urged the court to distinguish between a psychotherapist-patient privilege and a physician-patient privilege and to recognize the former. The court rejected the invitation and the privilege. It did not, however, base its decision on the outcome of the interest-balancing approach appropriate under Rule 501, but instead reasoned as follows:

> This circuit has declined to recognize a psychotherapist-patient privilege in federal criminal trials. In *United States v. Lindstrom*, 698 F.2d 1154 (11th Cir. 1983), and *United States v. Meagher*, 531 F.2d 752 (5th Cir.), *cert. denied*, 429 U.S. 853 [97 S.Ct. 146, 50 L.Ed.2d 128] (1976), the courts reasoned that evidentiary privileges in federal criminal cases are governed by common law unless modified or expanded by an Act of Congress, the Constitution or rules prescribed by the Supreme Court and that neither common law nor statutory law provides for any type of physician-patient privilege. The rationale of both the *Lindstrom* and *Meagher* courts is no less sound today than when those decisions were reached.

*Id.* at 567. As indicated, this court does not view Congress' decision to enact Rule 501 as it now stands as a rejection of the proposed privileges or as an intendment that the federal common law of privileges should be frozen as it existed at the time the Federal Rules of Evidence took effect. Rather, Rule 501 is a mandate to the courts to develop the federal common law of privileges as reason and experience dictate.

Several Circuits faced with an assertion of a psychotherapist-patient privilege have ducked the recognition issue, holding instead that even if such a privilege was available under federal common law it was not applicable in the circumstances existing in the cases before them. *United States v. Talley*, 790 F.2d 1468 (9th Cir.1986), *cert. denied*, 479 U.S. 866, 107 S.Ct. 224, 93 L.Ed.2d 152 (1986); *United States v. Crews*, 781 F.2d 826 (10th Cir.1986); *United States v. Barrett*, 766 F.2d 609 (1st Cir.1985), *cert. denied*, 474 U.S. 923, 106 S.Ct. 258, 88 L.Ed.2d 264 (1985); *In re Doe*, 711 F.2d 1187 (2d Cir.1983); *In re Pebsworth*, 705 F.2d 261 (7th Cir.1983). Several district judges, including Judge Weinstein, however, have found the privilege to be a part of the federal common law. *E.g., Lora*, 74 F.R.D. at 574. ("[I]t is desirable as a matter of social policy to protect psychotherapist-patient confidences by an evidentiary privilege at least to the extent that this may be done consistently with other social requirements."); *Jennings v. D.H.L. Airlines*, 101 F.R.D. 549 (N.D.Ill. 1984); *In re Doe*, 97 F.R.D. 640 (S.D.N.Y. 1983); *cf. In re Production of Records to Grand Jury*, 618 F.Supp. at 443 (recognizing a social worker-patient privilege under Rule 501). *But see United States v. Layton*, 90 F.R.D. 520 (N.D.Cal.1981) (declining to recognize a psychotherapist-patient privilege).

In sum, although the federal courts are split on this issue, we take our cue from those authorities, such as the Advisory Committee, *Zuniga*, and Judge Weinstein, who believe that there is a "strong policy basis" for the privilege. *Developments, supra*, at 1548.[13]

---

**13.** A frequently cited test for the existence of a privilege was proposed by Professor Wigmore. *See* 8 J. Wigmore, *Wigmore on Evidence* § 2285, at 527 (J. McNaughton rev. ed. 1961). Wigmore cites four requirements necessary to establish a privilege, all of which are met in the context of the psychotherapist-patient relationship.

First, Wigmore's test requires that the communications originate in a confidence that they will not be disclosed. Ordinarily, a patient who discloses highly personal information in private to a psychotherapist does so with the expectation that the conversation will not go beyond the closed office door.

Wigmore's second requirement is that confidentiality be essential to the full and satisfactory maintenance of the relationship between the parties. As stated above, some assurance of confidentiality is probably necessary if a patient is going to reveal his innermost thoughts to the therapist, which, of course, is important to the effective treatment of the patient.

## E. *The Case at Hand*

■ Recognition of the existence of a psychotherapist—patient privilege does not decide the issue before us. Privileges judicially created under Rule 501 are not absolute but remain capable of being overcome in the context of specific cases in which their justifications are not implicated. This is such a case. Indeed, this case suggests the need to expand the range of exceptions to the privilege beyond those contained in Proposed Rule 504.

■ In this case it appears that the psychologist's treatment of the lawyer was initiated primarily to further the lawyer's chances for success as an insurance claimant, and later as a plaintiff in a personal injury suit.[14] Though the lawyer may indeed have truly desired the benefits of psychotherapy, the lawyer was also fully aware, as an attorney, that if his personal injury suit went to trial and he placed his mental condition at issue, any confidences he entrusted to the psychologist would have been subject to disclosure during the litigation. Therefore, the psychotherapeutic relation at issue was one in which a concern for the patient's privacy was not a necessary pre-condition of the patient's undertaking therapy, and may have been wholly absent.[15] Thus, the twin justifications for the privilege lose much of their force in this situation.

On the other hand, the grand jury's need for privileged information is greater where it is the psychotherapist-patient relationship itself which may be facilitating the violation of federal criminal laws. The grand jury is looking into allegations that the lawyer and his law firm, with the assistance of physicians and possibly the psychologist, generated scores of phony and/or inflated personal injury claims through the use of fabricated medical and psychological reports, as well as inaccurate billing records. Counsel for P–Corp concedes that his client generated reports for the law firm, though of course he does not concede that such reports were fraudulent, on a regular basis and sent them via the

---

Third, the relation protected by the privilege must be one which, in the opinion of the community, ought to be sedulously fostered. As stated earlier, society has a profound interest in encouraging the treatment of emotionally disturbed individuals.

Fourth, Wigmore states that the injury to the relationship caused by disclosure must be greater than the benefit thereby gained for the correct disposition of litigation. Our normative conclusion is that society's interest in fostering psychotherapist-patient relationships and the privacy rights of patients outweighs the government's interest in securing evidence from patients' mouths. In sum, we believe the psychotherapist—patient privilege satisfies the Wigmore test, a conclusion also reached by the Advisory Committee. Advisory Committee's Note to Proposed Fed.R.Evid. 504, 56 F.R.D. at 242.

**14.** We assume, for the sake of deciding this dispute, that the lawyer was actually a patient of the psychologist. Proposed Fed.R.Evid. 504(a)(1). The psychologist is a licensed psychologist, and therefore a "psychotherapist" covered by the privilege model we are utilizing. Proposed Fed.R.Evid. 504(a)(2). Also assumed is P–Corp's right to assert the privilege on behalf of the lawyer, Proposed Fed.R.Evid. 504(c), even though it was the psychologist who actually treated the lawyer. The representations made by P–Corp's counsel on the record indicate that P–Corp was the psychologist, and nothing more, during the relevant time period. Also we have

accepted as true P–Corp's contention that the notes of treatment contain confidential communications, though we have not seen the notes and the movant did not suggest an *in camera* review. Furthermore, we assume that there actually was a psychotherapist-patient relationship between the psychologist/P–Corp and the lawyer, of some sort, even though P–Corp has made no showing of this. Before us, however, is the psychologist's report on the lawyer's psychological condition which provides some indication that some sort of relationship existed. For the court's subsequent inquiries as to the basis for the assertion of the psychologist-patient privilege, see the court's appended opinion.

**15.** At the hearing, P–Corp's counsel made several arguments which hinged on his understanding (at the time he received the subpoena) that the psychologist was not being investigated as a possible violator of federal law. Though we read the original affidavit as suggesting that the lawyer was suspected of fraudulently inflating his psychotherapy bills, we acknowledge that counsel might have been somewhat misled by its sparseness.

However, the subsequent submissions of the government have made clear that P–Corp and the psychologist are "subjects", though not yet "targets" of investigation. None of these arguments, except those made under *Schofield*, are important here. The only privilege P–Corp is asserting is its patient's, not its own.

United States mail. If such reports were fraudulent, and created by the psychologist at the behest of the law firm with the intention to inflate, or indeed create, personal injury claims then such conduct might very well be a violation of this nation's criminal laws. *See* 18 U.S.C. § 1341; 18 U.S.C. § 371.

▮] In a situation where the psychotherapist-patient relationship itself is potentially criminal in nature, this court believes that the privilege must give way to the federal government's interest in probing the true nature of the relationship. We operate under the potentially naive assumption that most psychotherapy patients engage in such therapy for reasons related to mental health and emotional well-being, not an interest in facilitating crime. The absence of the privilege when the psychotherapeutic relationship may be criminal will have, we believe, no adverse effect on society's interest in fostering psychotherapeutic treatment, or on the privacy interests of most psychotherapy patients. Without the subpoenaed records, there may be no way for the grand jury to adequately assess whether a crime was probably committed here—for this is the only information available providing a true insight into the relationship and activities of the lawyer and the psychologist with respect to the accident claim. A privilege would in these circumstances, shield potentially criminal activity. On this score, we believe:

> the grand jury has a right to penetrate this sham. The grand jury has a right to see in this relationship not a bona fide professional relationship between a doctor and his patient, but to see it for what they probably believe it is, a conspiracy to defeat the enforcement of the federal laws ...

*In re Grand Jury Subpoenas Served Upon Astor Medical Services,* M–11–188T, Transcript at 13–14 (S.D.N.Y.1981) (oral opinion) (quoted in *United States v. Witt,* 542 F.Supp. 696, 699 (S.D.N.Y.), *aff'd by oral opinion,* 697 F.2d 301 (2d Cir.1982)).

*Witt* was a case involving a grand jury subpoena issued to a physician, who claimed he was a psychotherapist for purposes of Proposed Rule 504, practicing in a Stress Center suspected of being, not a legitimate counseling center, but a "scrip mill" for the illegal distribution of quaaludes. The physician resisted the subpoena on grounds of the psychotherapist-patient privilege; the court rejected his argument. *Witt,* 542 F.Supp. at 698. In *In re Doe,* 711 F.2d 1187 (2nd Cir.1983), the Court of Appeals for the Second Circuit was faced with a similar situation. In *Doe,* a psychiatrist who saw 70 patients a day and prescribed quaaludes for over 90% of his patients, attempted to resist a grand jury subpoena duces tecum on grounds of psychotherapist—patient privilege. While the court did not doubt the patient's interest in keeping the relationship confidential, it disagreed that the privilege should be recognized on the facts of the case. In so ruling, the court relied heavily on the fact that there was no evidence of real psychotherapeutic relationships worthy of fostering which were at stake. *Id.* at 1193. The facts of other cases have suggested that the psychotherapist-patient privilege could result in abuse if allowed to shield investigations into health insurance fraud by psychotherapists. *See In re Pebsworth,* 705 F.2d 261; *In re Zuniga,* 714 F.2d 632.

Of similar concern is the prospect that the privilege will be utilized as a sword to fraudulently win personal injury and health insurance battles. The purposes served by the patient-litigant exception are applicable in situations, such as the case *sub judice,* where an individual who received the benefits of one part of our judicial system, i.e., by obtaining a settlement in a personal injury suit, seeks to withhold information by invoking the privilege in another court proceeding in which the suit is being investigated as fraudulent. *Developments, supra,* at 1554. We believe what Professor McCormick said with respect to the patient-litigant exception applies with full force here:

> It is arguable that legal protection from exposure is justified to encourage frankness in consulting physicians. But it is neither human, natural, nor understandable to claim protection from exposure by asserting a privilege for communications

to doctors, at the very same time when the patient is parading before the public the mental or physical condition as to which he consulted the doctor, by bringing an action for damages arising from that same condition. Indeed, it may well be that the privilege should give way in any case where there is a showing that the relationship, initiated for the purposes of litigation, may have been used to work a fraud upon other litigants or a court of law or administrative agency.

*McCormick's on Evidence*, § 103, at 222. In short, this court finds the potential for abuse too high in this situation, and the justifications for recognizing the privilege too negligible here, to frustrate a legitimate grand jury request for relevant information. The lawyer derived substantial benefit from his lawsuit—$12,500—and his use of the judicial system; society's interest in ensuring this system's integrity and in enforcing the federal criminal laws heavily outweighs any interest served by recognizing his claim for privilege. Indeed, it may well be that the privilege should give way in any case where there is a showing that the relationship, initiated for the purposes of litigation, may have been used to work a fraud upon other litigants or a court of law or administrative agency.

Before closing, the court also notes that the lawyer would probably not be able to assert the privilege as against a state grand jury subpoena. New Jersey's statutory privilege provides that confidential communications between a licensed practicing psychologist, such as the psychologist, and his patient, such as the lawyer, "are placed on the same basis as those provided between attorney and client...." N.J. Stat.Ann. § 45:14B–28 (West 1985). In New Jersey, the attorney-client privilege is "driven away" when the client seeks legal advice with an eye to committing a future crime. Comment to Rule of Professional Conduct 1.6, 1989 Rules Governing The Courts of the State of New Jersey at 173 (West). Of course, as in the attorney-client

context, there must be a *prima facie* showing that the patient sought the advice for an illicit purpose, but not that the psychologist wished to further the illegal conduct. Here, however, Judge Rodriguez of our district court has already determined that the crime-fraud exception to the attorney-client privilege has been established with respect to the law firm's records. Government's Exhibit 3.

■ Our reading of the record leads us to the conclusion that the crime-fraud exception to New Jersey's psychotherapist—patient privilege, which exists because the privilege is identical to the attorney-client privilege, is also applicable to the lawyer's treatment and billing records. For the purposes of a grand jury investigation, the exhibits and other record evidence before this court sufficiently establish this exception. *In re Grand Jury Proceedings (FMC Corporation)*, 604 F.2d 798, 803 n. 6. (3d Cir.1979).

■ The existence of such an exception under New Jersey law does not, of course, indicate that the exception should be a part of the federal common law. However, this court believes that the psychotherapist-patient privilege to be recognized in grand jury proceedings should not be more extensive than the privilege which is available under the state law under which the psychotherapist is licensed. The federal government need not sacrifice its interest in effective law enforcement in a situation where the state whose law governs the relationship would not subordinate its interest in effective law enforcement to foster psychotherapeutic relationships and protect its citizens' privacy.[16]

## IV. CONCLUSION

On the record before us, the psychotherapist-patient privilege does not apply. Therefore, movant's motion to quash the subpoena is denied. An order has been entered.

---

**16.** This is especially so since the effectiveness of a more extensive federal privilege in advancing the interests served by the privilege may be *de minimis* where state law is not equally nurtur-

ing, since we assume that questions involving this privilege will arise far more often in state court proceedings than in federal court.

## APPENDIX

Subsequent to the issuance of the subpoena to P–Corp but prior to this court's decision as to the enforceability of that subpoena, the grand jury issued an identical subpoena to the psychologist who is the sole shareholder of P–Corp. Like the first subpoena, the second demands the production of appointment books, billing records, and notes of treatment relating to a lawyer who was a patient of the psychologist. And like the first subpoena, the second subpoena has been objected to under *Schofield* and on the additional ground that it seeks information protected by privilege; in this case, both the psychotherapist—patient privilege and the Fifth Amendment's privilege against self-incrimination. We deal here with the psychologist's motion to quash, based on these objections and the United States' counter-request for enforcement of the subpoena.

Before reaching the merits of this motion, it is perhaps useful to outline the procedural path which led us to our present location. As is apparent, the first action in this matter occurred when P–Corp's records were subpoenaed. Unfortunately, a contemporaneous subpoena was not issued to the psychologist.

P–Corp moved to quash the subpoena, arguing that the requested records were protected by the psychotherapist-patient privilege. This court, perhaps unwisely, accepted the existence of records containing confidential patient communications for purposes of that motion because: (1) both the lawyer and the psychologist were claiming the Fifth Amendment privilege with respect to oral testimony; (2) there was evidence of a psychotherapist-patient relationship; and (3) counsel for P–Corp (who is also counsel for the psychologist), acting as an officer of the court, argued vigorously that the psychotherapist-patient privilege applied to records covered by the subpoena.

Shortly before our hearing, counsel for P–Corp informed the court that P–Corp did not own or control the treatment records relating to the lawyer; rather, these records were the personal property of the psychologist. Having no factual basis upon which to agree or disagree with this assertion, the court proceeded to hear P–Corp's motion to quash, assuming, perhaps erroneously, that the psychotherapist-patient privilege argument would not be pressed if P–Corp possessed *no* records, rather than all or just some of such records, which counsel believed were shielded by the psychotherapist-patient privilege [1]. Also the court remained keenly aware that the person who could clear the mystery up was a subject of a grand jury investigation who did not wish to reveal to the grand jury whether any of the subpoenaed documents in fact existed. Because we became increasingly uncertain that there was, at bottom, an adequate ground for asserting a psychotherapist-patient privilege with respect to the two subpoenas, this court acted to satisfy itself that it was not engaged in a merely academic exercise. After doing so, the court is now certain that an adequate basis for the assertion of the psychotherapist-patient privilege exists with respect to at the least the subpoena issued to the psychologist, if not the subpoena issued to P–Corp.

At our first hearing on this matter, counsel for P–Corp withdrew his objection to the subpoena's request for appointment books and billing records, since he conceded that to the extent a psychotherapist-patient privilege existed in federal law it only applied to confidential communications made by a patient during therapy. Despite this, after our order denying the motion to quash was entered no representative of P–Corp appeared before the grand jury, in compliance with the subpoena, to produce those records to which the privilege had been conceded not to apply, nor did a representative of P–Corp appear to testify that it did not own the notes of treatment

---

1. And if P-Corp possesses and controls no records to which a privilege of the lawyer's might attach, it had no standing to raise the psychologist-patient privilege, no legal basis to do so, and no reason not to send a representative before the grand jury in compliance with the subpoena.

sought. An order enforcing the subpoena was filed and P–Corp still did not comply, and thus this court issued an order of contempt against P–Corp, from which an appeal was taken.[2]

After the P–Corp appeal was taken, the psychologist filed this motion to quash. The motion to quash is based on three grounds: (1) the inadequacy of the government's *Schofield* affidavit; (2) the psychotherapist-patient privilege; and (3) the Fifth Amendment's privilege against self-incrimination. We will deal with each of these contentions.

## A. *The Schofield Objection*

The psychologist contends that the government's sworn submissions are inadequate and do not demonstrate the relevance of *all* the treatment and billing records to the grand jury's investigation. Moreover, the psychologist argues that the government has not pointed to any evidence which suggests that the relationship between the lawyer and the psychologist was anything other than a legitimate therapist-patient relationship.

In response to this renewed objection, the government filed an additional sworn submission with factual exhibits attached. This new submission indicates that the lawyer has been in not one, but two automobile accidents. The first occurred on February 4, 1982, over a year before the June 1, 1983 accident discussed earlier in our opinion with respect to P–Corp.

After the February 4, 1982 accident, the lawyer, according to reports signed by the psychologist, engaged in psychotherapy with the psychologist. "Attending Physician Reports" signed by the psychologist and dated April 29, 1982, July 6, 1982, December 5, 1983, and May 18, 1984 were submitted by the lawyer to his no-fault

insurance carrier to support his request for a payment of $1,475.00 to cover psychotherapy. Government's Exhibit 3. These reports diagnosed the lawyer as suffering from "Post–Traumatic Stress Disorder," a condition the psychologist indicated was solely a result of the February 4, 1982 accident. *Id.*

After his June 1, 1983 accident, the lawyer also submitted attending physician reports dated October 11, 1983 and May 18, 1984 to his no-fault carrier. Government's Exhibit 4. These reports were prepared so that the lawyer could obtain payment for therapy sessions with the psychologist. The reports indicated that the lawyer was suffering from "Generalized Anxiety Disorder" resulting *solely* from the June 1, 1983 accident. *Id.*

As mentioned in our opinion as to P–Corp, the lawyer filed a "pain and suffering" claim with an insurance company, seeking compensation for harm caused by the June 1, 1983 accident. This claim culminated in a lawsuit in the Superior Court of New Jersey, which was settled for $12,500.

A psychological consultation report prepared by the psychologist was sent to the insurance carrier in support of the lawyer's personal injury claim. Government's Exhibit 7. The report indicates that the lawyer had a serious automobile accident in February, 1982 and required extended psychological counseling as a result of the accident. *Id.*

A psychological consultation report was also prepared by the psychologist on August 12, 1982 with respect to the February 4, 1982 accident. Government's Exhibit 6. The two reports are markedly similar, and a fair comparison of the lawyer's symptoms as reported by the psychologist was prepared by the government:

---

**2.** An appeal was taken from our denial of P–Corp's motion to quash. As our denial of the motion to quash was not appealable, *See, e.g., In re Grand Jury Matter* (John F. Kennedy Memorial Hospital), 802 F.2d 96, 98 (3d Cir.1986), we believed that we still maintained jurisdiction to issue the subsequent contempt order. Otherwise, needless delay would have ensued.

| 1982 Report<br>Government Exhibit 6 | 1983 Report<br>Government Exhibit 7 |
|---|---|
| 1. Anxiety | 1. Anxiety |
| 2. Flashbacks | 2. Flashbacks |
| 3. Phobic reaction | 3. Phobic reaction |
| 4. Difficulty falling asleep and staying asleep | 4. Difficulty falling asleep and staying asleep |
| 5. Constant fatigue resulting in irritability | 5. Fatigue has made him feel edgy and irritable |
| 6. Abrupt with family and generally argumentative with other people and over-reacts to minimal stressful situations | 6. Abrupt and aggressive in his interactions, and tends to over-react to people and situations |
| 7. Depression resulting in feelings of lethargy | 7. Suffers from feelings of lethargy |
| 8. General malaise | 8. General malaise |
| 9. Loss of libido | 9. Loss of libido |
| 10. Social withdrawal and isolation | 10. Isolated from social contacts, becoming considerably withdrawn |
| 11. Entrenched in a self-perpetrating negative predicament | 11. Resulting in a self-perpetrating negative predicament |
| Diagnosis: Post-traumatic Stress Disorder | Diagnosis: Generalized Anxiety Disorder |

Government's Response to Motion to Quash at 8.[3]

Despite these similarities in symptomatology, the attending physician's reports generated after the June 1, 1983 accident contained the following set of answers:

When did symptoms first appear?

Date: June 1, 1983.

When did the patient first consult you for this condition?

Date: June 17, 1983

Has patient ever had same or similar condition? (answered "no").

Is condition solely as a result of the accident? (answered "yes").

Government's Exhibit 4.

While counsel for the psychologist offered to produce testimony from other psychologists to the effect that given the lawyer's treatment history they would have answered this question the same way, this court declined to order an evidentiary hearing on this matter. The court is satisfied that the prior sworn submissions of the government were adequate under *Schofield*, and this present submission merely strengthens our view that the records

sought by the grand jury are relevant to an investigation within its jurisdiction.

The grand jury has a right to determine whether the treatment for which the lawyer sought reimbursement from insurance carriers was, in fact, the result of the February 4, 1982 car accident, the June 1, 1983 accident, or reasons wholly unrelated to either. Certainly, the psychologist's indication in 1983 that the lawyer had never had a condition similar to that he was experiencing after the June 1, 1983 accident could be viewed as inaccurate, and in the context of a submission to an insurance company for purposes of payment, potentially fraudulent.[4]

And while the psychologist argues that if there is fraud here it consists in the billing records and not the notes of treatment, it is the notes of treatment which may well be the necessary evidence to determine whether the requests for payment and the personal injury suit were or were not fraudulent. Suppose, for example, the psychologist and the lawyer had truly engaged in psychotherapy but not as a result of the car accidents but rather because of the lawyer's marital or other problems. If the

3. The government's comparison chart was wholly accurate except for number eight, which, in the government's brief, read "general malice" instead of, as it should have, "general malaise." Undoubtedly, this was a "Freudian slip."

4. The court, of course, disclaims any adoption of any inferences drawn by the Government, except to say that they are reasonable enough to bring the sought after documents within the relevancy requirements of *Schoefield*.

lawyer and the psychologist later sought reimbursement from insurance carriers on the basis that the treatment was *solely* the result of auto accidents, the only possible way to discover this would be to probe the nature of the therapy via treatment records. And, of course, the treatment records could also be exculpatory if they suggest that treatment, as indicated by the notes, truly was the product of the causes stated by the psychologist and the lawyer.

In sum, for the reasons stated in our opinion as to P–Corp and based on the new submissions of the government, we are satisfied that the subpoena is well within the bounds required by *Schofield.*

### B. *The Psychotherapist–Patient Privilege*

 Counsel for the psychologist has again raised the psychotherapist-patient privilege recognizing, of course, that we have fully treated with this issue in our opinion, *supra,* and did so with full knowledge that the subpoena issued to the psychologist would raise an identical issue as to the applicability of the privilege. However, counsel has raised arguments which indicate the need for some additional illumination of two aspects of our earlier treatment of this issue.

First, counsel points out that the lawyer could have, prior to going to trial, dropped his claim for "emotional distress." However, the fact is that the lawyer never had to drop his "emotional distress" claim since he obtained a satisfactory settlement. If, however, the lawyer had pressed his mental distress claim to trial, his treatment records could have been used by his opponent at trial subject only to an *in camera* review for relevancy. *Arena v. Saphier,* 201 N.J.Super. 79, 81, 492 A.2d 1020, 1021 (A.D.1985). In any case, our view is that when a psychotherapy patient uses his emotional and/or psychological condition to successfully pursue an insurance claim or lawsuit, any privilege must give way if there is a legitimate investigation into the possibility that the claim or lawsuit is fraudulent.

Second, this court believes that even if it is accepted that there was a true therapeutic relationship between the lawyer and the psychologist, the privilege should still give way here. For if treatment was represented by the psychologist and the lawyer to be the result of one or both of the two auto accidents, and was in fact the result of another cause, those representations could still be fraudulent. Moreover, if society wishes to encourage insurance carriers to reimburse persons for psychotherapeutic treatments, it must guarantee that fraud of the type suggested to have possibly existed here can be effectively investigated.

With these two amplifications in mind, we deny the psychologist's request to quash the subpoena on the basis of the psychotherapist-patient privilege, for reasons *identical* to those expressed in our opinion on P–Corp's motion to quash.

### C. *The Fifth Amendment Privilege*

 The Fifth Amendment of the United States Constitution provides that no person "shall be compelled in any criminal case to be a witness against himself." By affidavit taken in his capacity as an officer of P–Corp, the psychologist says that any notes of treatment related to the treatment of the lawyer are his own personal property.

As such, the psychologist argues that the Fifth Amendment prevents the government from requiring him to produce the subpoenaed documents, since the very act of producing them could prove incriminating. To obviate this objection, the government is in the process of obtaining a statutory grant of immunity pursuant to 18 U.S.C. §§ 6002 and 6003 protecting the psychologist from any self-incrimination that might accompany the act of producing the subpoenaed documents. *See United States v. Doe,* 465 U.S. 605, 617 n. 17, 104 S.Ct. 1237, 1244 n. 17, 79 L.Ed.2d 552 (1984). This is sufficient since the psychologist has not argued that the subpoenaed records, which pertain to his business, were produced under compulsion. As such, the contents of the records are not protected by the Fifth Amendment. *Doe,* 465 U.S. at 610–12, 104

**1020**

S.Ct. at 1240–42. Therefore, the psychologist's motion to quash the subpoena on Fifth Amendment grounds is denied, on the condition he is provided the promised statutory grant of act of production immunity.

**D.** *Conclusion*

By an appropriate order, the motion to quash the subpoena will be denied in its entirety, and the psychologist will be ordered to comply with its terms.